**Lori FLETCHER, Plaintiff, Appellee,**

v.

**TOWN OF CLINTON, Dean Bessey, and Todd Genest, Defendants, Appellants.**

**No. 99–1377.**

United States Court of Appeals, First Circuit.

Heard Sept. 8, 1999.

Decided Nov. 8, 1999.

Edward R. Benjamin, Jr., with whom Thompson & Bowie was on brief, for appellants.

C.H. Spurling, for appellee.

Before STAHL, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge,* and LYNCH, Circuit Judge.

LYNCH, Circuit Judge.

On July 17, 1997, Lori Fletcher obtained an ex parte domestic violence restraining order against her abusive boyfriend, William McDonald. McDonald was ordered to stay away from Fletcher and her residence. Informed that McDonald had been seen in Fletcher's home recently, two Clinton, Maine police officers drove by her house on July 31, 1997. They saw McDonald there. Aware of the restraining order and past occasions on which Fletch-

er sought police help, the police entered her home, despite her objections and her assertion that McDonald was not in the house. A fracas resulted during which Fletcher was arrested and McDonald escaped. McDonald turned himself in the next day. No charges were ever prosecuted against Fletcher.

Fletcher then brought a federal civil rights action against the officers, the Town, and the bail commissioner. A Magistrate Judge denied the defendants' motion for summary judgment on the grounds of qualified immunity, and they appeal. We affirm in part and reverse in part, hold that the officers have qualified immunity as to Counts I and II of the complaint, and find the defendants have waived their appeal from the denial of immunity as to Count III. We vacate the Magistrate Judge's denial of summary judgment as to the Town of Clinton, and remand for further proceedings.

## I

Fletcher filed suit against police officers Dean Bessey and Todd Genest, bail commissioner William Cyr,[1] and the Town of Clinton, Maine on May 15, 1998, alleging violations of 42 U.S.C. § 1983 and state tort and criminal laws.[2] Count I of the complaint alleges violations of § 1983 stemming from the officers' first entry into her home and her subsequent arrest; Count II concerns the officers' second entry into her home that night and "her subsequent detention and interrogation." Finally, Count III alleges a § 1983 violation stemming from the bail process.

The Magistrate Judge[3] denied the motion for summary judgment as to the offi-

---

* Of the Eighth Circuit, sitting by designation.

1. Cyr's motion to dismiss on immunity grounds was granted and Cyr is not involved in this appeal.

2. The Magistrate Judge found that the defendants were protected from the state claims by discretionary function immunity. *See* Me. Rev.Stat. Ann. tit. 14, § 8111(1)(C). He also

concluded that Fletcher's claim under the Maine Freedom of Access Act was untimely. Fletcher does not appeal these rulings.

3. The parties consented to the Magistrate Judge conducting all proceedings in this matter. Thus, the Magistrate Judge's rulings were not reviewed by a District Court Judge.

cers and the Town, concluding that the officers violated Fletcher's clearly established Fourth Amendment rights in circumstances in which no reasonable officer could have believed that his or her actions were not in violation of such rights. In concluding that there were no exigent circumstances justifying the officers' actions, the Magistrate Judge relied on the officers' "lack of haste" in going to Fletcher's home after hearing that McDonald had been seen there earlier, the lack of a history of physical violence in the pair's relationship, and the fact that the police "saw nothing to suggest Plaintiff was in danger" that evening.

## II

We briefly address the question of appellate jurisdiction. Fletcher argues that this court is without jurisdiction to hear the defendants' appeal, as that appeal is "based on allegations of factual error by the court below."

■ The jurisdictional rules in this area are clear. Ordinarily, appeals from denials of summary judgment will not be entertained. *See Buenrostro v. Collazo*, 973 F.2d 39, 41 (1st Cir.1992). There is, however, a narrow exception for denials of pretrial motions based on claims of qualified immunity. *See Johnson v. Jones*, 515 U.S. 304, 311–12, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). Such denials are reviewable "only to the extent that the qualified immunity defense turns upon a 'purely legal' question." *Díaz v. Díaz Martínez*, 112 F.3d 1, 3 (1st Cir.1997); *see also Tang v. Rhode Island*, 120 F.3d 325, 326 (1st Cir.1997). "[A] district court's pretrial rejection of a qualified immunity defense is not immediately appealable to the extent that it turns on either an issue of fact or an issue perceived by the trial court to be an issue of fact." *Díaz*, 112 F.3d at 3 (quoting *Stella v. Kelley*, 63 F.3d 71, 74 (1st Cir.1995)) (internal quotation marks omitted).

■ Fletcher is correct that there would be no appellate jurisdiction here if summary judgment were properly denied because there were material facts in dispute. Fletcher is also correct that there are disputes of fact concerning many of the details of the events in question. But the Magistrate Judge clearly based his decision on a determination that summary judgment was not available as a matter of law. *See id.* ("If the pretrial rejection of the qualified immunity defense is based on a purely legal ground, such as a finding that the conduct described by the plaintiff, assuming it occurred, transgressed a clearly established right, then the denial may be challenged through an interlocutory appeal."). Our independent review of the record shows that the disputed facts are not material and that the issue of immunity may properly be decided on the basis of the undisputed facts.

## III

The essentials of the event are undisputed. We view the facts in the light most favorable to Fletcher. *See Swain v. Spinney*, 117 F.3d 1, 8 (1st Cir.1997).

Before the night of July 31, 1997, Fletcher had called the police for help with McDonald three separate times before she obtained a restraining order. On May 22, 1997, Fletcher called the police and complained that McDonald was extremely angry, was refusing to leave her home, and had thrown her kitten across her apartment. Officer Genest went to Fletcher's home, where Fletcher told him that things were now under control. A pastor from Fletcher's church had arrived and McDonald had agreed to leave with him. The police left once McDonald did.

About two weeks later, on June 6, 1997, Fletcher called the police again. She told the dispatcher that McDonald was drunk, had refused to leave, and was stealing her property and threatening to damage her car. The dispatcher heard McDonald tell Fletcher to hang up the phone and call someone to come pick him up; the dis-

patcher urged Fletcher to stay on the line until officers arrived. The dispatcher heard an escalating argument and got McDonald on the phone. Officers Genest and Bessey arrived shortly thereafter and found McDonald outside the home. Despite their orders not to do so and their warnings of arrest if he persisted, McDonald tried to go back into Fletcher's home. McDonald was arrested and charged with criminal trespass. McDonald was later released on bail on the condition that he not have any direct or indirect contact with Fletcher or her home.

On July 16, 1997, Fletcher again called the police, this time from the home of Clinton Police Sergeant Steve Trahan (or his mother). Fletcher said that her "ex-boyfriend" McDonald was in her home in violation of his bail conditions and that she had been forced to flee to call for help. Fletcher told the police that McDonald had been at her home when she returned from work, that they had argued, and that Fletcher had fled to her car. She was talking to McDonald's ex-girlfriend (who had called to speak with McDonald) on her cordless phone. McDonald had been "screaming in the background." When Fletcher asked McDonald's ex-girlfriend to call for help, McDonald had grabbed the phone away and thrown it into a field. Fletcher went for help and the ex-girlfriend called the police. Fletcher did not know Sergeant Trahan, but she had seen a police car parked outside of the house and was "just taking a chance hoping someone was there that could help [her]."

Officers picked up Fletcher and took her home. McDonald was gone. They saw that McDonald had damaged Fletcher's property, and noted that her kitten's eye was swollen shut. McDonald telephoned Fletcher while the police were with her; he told her that he was in Fairfield, Maine. It was a ruse. When the police left to find

him, McDonald appeared outside of Fletcher's house. Fletcher once again called the police. McDonald was arrested later that evening, his bail was revoked, and he was returned to jail.

The next day, July 17, Fletcher applied for an ex parte temporary restraining order against McDonald in the state district court. Under Maine law at the time,[4] temporary ex parte orders of protection could be granted on a showing of "[i]mmediate and present danger of physical abuse to the plaintiff." Me.Rev.Stat. Ann. tit. 19, § 765(2). In her application, Fletcher swore that she was "in immediate and present danger of abuse by the defendant." She described the previous day's events—the same events she had described to the police the night before—and reported that she had "called for help on previous occassions [sic] because [she] was freightened [sic] for [her] safety and for the safety of [her] property." Fletcher also told the court that McDonald had "threatened [her] on several occassions, [sic] that if I leave him he will wreck my car and my belongings." The court issued an order that prohibited McDonald from, among other things, entering Fletcher's home and having any contact, direct or indirect, with her. The order was served on McDonald in jail. A copy was also delivered to the Clinton Police Department, as the agency responsible for enforcing the order.

On the evening of July 31, 1997, the date of the incidents in question, Officers Genest and Bessey went on duty at 6 p.m. Shortly before going on duty, Trahan informed Genest that he had seen McDonald at Fletcher's home, when Fletcher was not there, earlier in the day or the day before. Both Genest and Bessey were aware of the history of problems between Fletcher and McDonald. Genest had responded to Fletcher's May 22 and June 6 calls for

4. The Maine statutes governing protective orders when Fletcher applied for protection were repealed effective October 1, 1997. *See* Act of Apr. 11, 1996, ch. 694, § B-1, 1995 Me. Laws 1919, 1923. The current law concerning protective orders is set forth in Me. Rev.Stat. Ann. tit. 15, § 321.

help, and Bessey had responded to the June 6 call. Additionally, both officers were aware of the events of July 16 and knew that Fletcher had obtained a restraining order against McDonald. Before leaving the station, Genest called the Kennebec County Sheriff's Office and was informed that the restraining order was still in effect.

At approximately 9 p.m. that evening, the officers drove past Fletcher's home. As they drove by, they both saw a man they recognized as McDonald through a first floor window.[5] He was standing in Fletcher's bedroom and talking to her.

The officers did not see any sign of conflict between Fletcher and McDonald. Their prior experiences with McDonald as well as their knowledge that a protective order existed made them concerned for Fletcher's safety, however. As Genest stated in his affidavit, "[i]t was apparent to me that the situation had escalated to the point that Ms. Fletcher feared for her safety to the point of repeatedly calling for police assistance and obtaining a court order prohibiting Mr. McDonald from having any contact with her or her property." Bessey reacted similarly, concluding that Fletcher's life was in danger because of "Mr. McDonald's violent nature," "Mr. McDonald's drinking, her calling us, calling the county, [and] her putting a protection order on him." The officers turned their cruiser around and stopped briefly to contact Trahan. Trahan once again confirmed that the restraining order was in effect and told them to pick up McDonald and bring him in.[6]

On returning to Fletcher's home, Bessey knocked on the front door while Genest went to the window where they had seen Fletcher and McDonald earlier "to ensure that McDonald did not harm Fletcher" and to "watch McDonald in case he tried to flee." When Genest approached the window, he saw Fletcher in her bedroom.[7] Although Bessey's knocking was audible in the bedroom and although Fletcher had seen the police cruiser outside, she ignored the knocking at her door. Speaking through her window, Genest told Fletcher that he was from the Police Department, that he knew McDonald was in the home, and that she should go to the door. He said that he would arrest her if she did not. She denied that McDonald was there.

Genest and Bessey say that Fletcher eventually went to the door and opened it. Fletcher, in contrast, says that she never opened the door, but that the officers let themselves in through the front door, which might have been locked. We will take Fletcher's version of events.

Once inside, the officers saw Fletcher and told her that they were looking for McDonald and knew he was in her home.[8] Fletcher denied that McDonald was there, said that a friend of hers was in the bath-

5. While Fletcher argued that McDonald was in the kitchen at around 9 p.m. and that the kitchen is not viewable from the street, this assertion is not sufficient to create a genuine factual dispute. First, Fletcher does not claim that McDonald was in the kitchen at the time the officers drove past her house. She only claims that he was in the kitchen around the time when she heard the officers knock on her door. Second, Fletcher's deposition does not support her claim that the kitchen area is not viewable from the street.

6. Fletcher asserts, without record support, that it is disputed whether the officers confirmed the existence of the protective order. This is insufficient to create a material factual dispute. Fletcher also claims that it is disput-ed how and from where the officers called Trahan before proceeding to her front door. Disputes about such details do not affect our analysis.

7. There is a dispute, although not one that is material, as to whether Genest saw both Fletcher and McDonald in the bedroom at this time or only Fletcher. We accept Fletcher's version of events.

8. There is some ambiguity as to when precisely the officers crossed the threshold into Fletcher's home. This is not a material dispute, and we accept Fletcher's claim that the officers entered the home prior to having the conversation with McDonald through the bathroom door.

room, and ordered the officers to leave. McDonald spoke from behind the bathroom door, saying he was someone else. The ploy backfired. The officers immediately recognized McDonald's distinctive accent.

Bessey observed that Fletcher "acted kind of shook up and wanted us to leave" and that it seemed as though "Mr. McDonald was directing Ms. Fletcher to request that we leave the residence." Genest knew that McDonald had interfered with Fletcher's attempts to get help on a previous occasion and said that he "did not know if that was the case in this situation, or whether Mr. McDonald had threatened to harm Ms. Fletcher if she told us he was in the apartment and had him arrested."

The officers decided to go further inside the house. As they moved toward the bathroom, Fletcher picked up the phone and dialed 911. Genest took the phone from her hand, told the dispatcher who he was, and explained that no assistance was needed at that time. He hung up the phone and the officers went to the bathroom door. Fletcher stayed close to the officers, demanding they leave and insisting that they had no legal right to be there. Fletcher was warned that she would be arrested if she did not stop interfering with their efforts to reach McDonald. She continued and Genest handcuffed her and placed her in the bedroom.

The officers eventually got the bathroom door open. After a struggle with McDonald, the officers sprayed pepper spray into the bathroom and McDonald slammed the door closed, leaving the officers outside. When the officers opened the door after waiting for the pepper spray to clear, they found McDonald had escaped out the bathroom window. Both officers left the house to pursue McDonald.

As Genest left the house, he heard the door close and lock behind him. Fearing that McDonald had reentered the home and knowing that Fletcher was vulnerable in her handcuffed position, Genest returned to the front door, found it locked,

and shouted a demand that the door be opened. Fletcher did not hear Genest's demand. When there was no response, Genest kicked the door in. He discovered that Fletcher had slipped out of her handcuffs and that she was the one who had locked the front door. She had again called 911, and Genest again removed the phone from her hand and spoke to the dispatcher. Genest then handcuffed Fletcher and took her to the police cruiser.

Meanwhile, Bessey had not found McDonald. Genest radioed for assistance and the officers who reported to the scene proceeded to search for McDonald. They did not find him.

Fletcher was eventually taken by Genest and Bessey to the police station, where she waited until the bail commissioner arrived. Fletcher was released on bail that evening. No charges were ever prosecuted against Fletcher. McDonald turned himself in the next day, and was released on bail. He eventually pled guilty to violation of the protective order.

## IV

■■ We review the grant or denial of summary judgment de novo. *See Swain,* 117 F.3d at 5. Qualified immunity analysis is two-pronged. "First, the court must establish whether the constitutional right asserted by the plaintiff was 'clearly established' at the time of the alleged violation." *St. Hilaire v. City of Laconia,* 71 F.3d 20, 24 (1st Cir.1995). Under this prong, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)) (internal quotation marks omitted). Second, the court must ascertain "whether a reasonable official situated in the same circumstances should have understood that the challenged conduct violated that established right." *Id.* (quoting *Hegarty v. Somerset County,* 53 F.3d 1367, 1373 (1st Cir.1995))

(internal quotation marks omitted). This is an objective inquiry that involves asking "whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed ... after the fact." *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam). We analyze this case under the second prong.

## A. The Warrantless Entry Claims

■ Fletcher claims that both the initial entry into her home and the reentry after McDonald had escaped through the bathroom window violated her Fourth Amendment rights. Both entries were without warrant and we evaluate these claims together.

■ It is clearly established that a search warrant is ordinarily required to enter the home of a third person to arrest an individual who is believed to be inside the home. *See Steagald v. United States*, 451 U.S. 204, 216, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). This rule applies regardless of the existence of an arrest warrant. *See id.* Just as clearly established, however, is the "exigent circumstances" exception to this rule. *See Joyce v. Town of Tewksbury*, 112 F.3d 19, 21–22 (1st Cir. 1997) (en banc). Exigent circumstances exist where "there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." *United States v. Almonte*, 952 F.2d 20, 22 (1st Cir.1991) (quoting *United States v. Adams*, 621 F.2d 41, 44 (1st Cir.1980)) (internal quotation marks omitted).

■ There are four recognized categories of exigent circumstance: "(1) 'hot pursuit' of a fleeing felon; (2) threatened destruction of evidence inside a residence before a warrant can be obtained; (3) a risk that the suspect may escape from the

residence undetected; or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to herself." *Hegarty*, 53 F.3d at 1374. The defendants say that "safety" exigencies justified their warrantless entries into Fletcher's home.[9]

■ An officer's *reasonable* belief that the delay needed to obtain a warrant would pose "a threat to police or the public safety" is sufficient to create exigent circumstances. *United States v. Curzi*, 867 F.2d 36, 42 (1st Cir.1989) (internal quotation marks and citation omitted). "[T]he Supreme Court's standard of reasonableness is comparatively generous to the police in cases where potential danger, emergency conditions or other exigent circumstances are present." *Roy v. Inhabitants of Lewiston*, 42 F.3d 691, 695 (1st Cir.1994). Fletcher, ably represented, argues that the police were required to obtain a warrant because it was unreasonable to conclude that her safety was threatened.

To the extent that the decision below rested on the ground that the officers did not see McDonald being violent toward Fletcher, that ground alone is inadequate to deny immunity. Evidence of extreme danger in the form of shots fired, screaming, or blood is not required for there to be some reason to believe that a safety risk exists. *See Tierney v. Davidson*, 133 F.3d 189, 198 (2d Cir.1998) ("[T]he absence of blood, overturned furniture or other signs of tumult" did not render the officer's belief that danger existed unreasonable and did not require the officer "to withdraw and go about other business, or stand watch outside the premises listening for the sounds of splintering furniture."); *United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir.1995) ("We do not think that the police must stand outside an apartment,

9. Although defendants' brief also raised the "hot pursuit" exception, we do not analyze that claim in light of our holding. The officers clearly state in their depositions that they did not consider this to be "hot pursuit."

Instead, they relied on "exigent circumstances," which they defined as "[c]ircumstances that if you don't do something right away something could happen" or "[w]hen you're in fear of somebody's life."

despite legitimate concerns about the welfare of the occupant, unless they can hear screams. Doubtless outcries would justify entry, but they are not essential." (citation omitted)).

On the spot reasonable judgments by officers about risks and dangers are protected. Deference to those judgments may be particularly warranted in domestic disputes. In those disputes, violence may be lurking and explode with little warning. Domestic violence victims may be intimidated or suffer from a dependence inherent in the abusive relationship. The signs of danger may be masked. *See generally State v. Greene,* 162 Ariz. 431, 784 P.2d 257, 259 (Ariz.1989) (en banc) (noting that domestic violence calls "commonly involve dangerous situations in which the possibility for physical harm or damage escalates rapidly"); S.Rep. No. 102–197, at 38 (1991) (noting that "fear of retaliation and the lingering stigma of sex crimes and violence in the home" mean that "[b]oth literally and figuratively, these crimes remain hidden from public view"); Charles Patrick Ewing, *Battered Women Who Kill* 19 (1987) (noting that battered women often form a "traumatic bond" with their abusers, which leads them to become "extremely dependent" on their abuser and makes them "more incapable of fending for themselves"); Bureau of Justice Statistics, U.S. Dep't of Justice, Rep. No. NCJ–167237, *Violence by Intimates* at v (1998) (noting that one of the "most common reasons given by victims for not contacting the police" was that they "feared retaliation"). Maine has had many episodes of domestic disputes turning violent and even fatal. *See* Maine Coalition for Family Crisis Services, *Domestic Abuse in Maine: Data Project 1990–1995,* at 26 (n.d.) (finding that 51% of all homicides in Maine from 1990–1995 were "domestic violence related").

Police must often make balanced choices. Domestic violence situations require police to make particularly delicate and difficult judgments quickly. *See Tierney,* 133 F.3d at 197 ("Courts have recognized the combustible nature of domestic disputes, and have accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger."). At the same time, officers must respect basic freedoms guaranteed by the Fourth Amendment. A person's home is her sanctuary, not ordinarily to be entered by the police unless that entry is authorized by a warrant. *See Payton v. New York,* 445 U.S. 573, 585–87, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). This is true, even when the officers want to enter the home in order to arrest a third person whom they believe is there.[10] *See Steagald,* 451 U.S. at 216, 101 S.Ct. 1642. Victims of domestic violence do not give up their constitutional rights or the sanctity of their homes as the price for obtaining a restraining order against an abuser.

The balanced choice the officers must make is protected by qualified immunity if it is an objectively reasonable one. The officers here chose not to seek a warrant, which inevitably would have caused delay. If their choice not to delay but to enter Fletcher's home was an objectively reasonable one, then the officers receive the protection of qualified immunity. Such immunity is given not only for the protection of the officers, but also to protect victims of crime. In the domestic violence context, immunity is given so that officers will not have strong incentives to do nothing when they believe a domestic abuse victim is in

**10.** Officer Genest testified that he originally understood that they were going to Fletcher's house to pick up McDonald for violating the protective order. Entry into Fletcher's home was only permissible with a search warrant or in the face of exigent circumstances; the existence of the protective order and legal grounds to arrest McDonald cannot, standing alone, justify the entry. *See Steagald,* 451 U.S. at 216, 101 S.Ct. 1642; *Joyce,* 112 F.3d at 21–22.

danger.[11] Permitting suit against officers who have acted reasonably when there is reason to fear would create exactly the wrong incentives. Indeed, if the officers had done nothing, and Fletcher had been injured, they would have faced the threat of suit. In either event, their choice would be protected if it was objectively reasonable in light of clearly settled law.

Officers' decisions to enter a home to ensure the safety of those believed to be at risk of domestic violence have been found reasonable by other courts. *Cf. United States v. Gwinn*, 46 F.Supp.2d 479, 482–83 (S.D.W.Va.1999) (finding entry to be reasonable, even though alleged abuser had been detained, because alleged victim was crying and might have needed assistance); *Greene*, 784 P.2d at 259 ("The call [to 911] itself creates a sufficient indication that an exigency exists allowing the officer to enter a dwelling if no circumstance indicates that entry is unnecessary."); *State v. Lynd*, 54 Wash.App. 18, 771 P.2d 770, 773 (Wash.Ct.App.1989) (concluding that entry was reasonable where there had been a hang-up call to 911 and the husband, who was outside the house, reported that he and his wife had been arguing).

In this case, Fletcher's arguments—that the officers' belief that there was a threat to her safety was unreasonable—do have some weight. The officers saw no violence occurring within the home. Fletcher clearly told the officers that she did not want them in her home that night. McDonald had not been physically violent with Fletcher, Fletcher had not hesitated to call the police when she felt in danger,

and the officers saw no evidence of violence. Despite these facts, the officers intervened, and Fletcher, who had sought the protection of the law, was the one arrested. But Fletcher's subjective view of the facts is not the test. We conclude that an objectively reasonable officer, facing the circumstances that Genest and Bessey faced that evening, could have concluded that both of the warrantless entries into Fletcher's home were justified by the threat to Fletcher's safety.

It was reasonable to conclude that Fletcher was at risk. The sequence of events described earlier—three calls to the police, a protective order, McDonald's being jailed—could easily lead the officers to the conclusion that Fletcher was at risk on the night of July 31, indeed at greater risk than she had been previously. There was good reason to believe that McDonald might well be vindictive and try to hurt Fletcher for having him arrested on July 16 and sending him back to jail. Fletcher's own testimony was that she sought the protective order because she felt that the situation might escalate dangerously.[12]

> I was afraid that he would come back to my apartment when he did get out of jail and be very, very upset that they had arrested him and tried [sic] to blame it on me.... I was afraid that he could hurt me because—he had never hurt me, but he had hurt people in the past and he had thrown my kittens, so, yes, I was afraid.

Fletcher's fear was well-founded. Arrests, protective orders, and other attempts to break the cycle of violence often

**11.** The historic difficulty in motivating police to protect victims of domestic violence has been noted by legislatures, commentators, and courts. *See, e.g., Soto v. Flores*, 103 F.3d 1056, 1068 (1st Cir.1997); *Watson v. City of Kansas City*, 857 F.2d 690, 696 (10th Cir. 1988); H.R.Rep. No. 103–395 (1993) (concluding that the "law enforcement response to the epidemic of violence against women has been inadequate" and that the "legal system has historically failed to address violence against women with appropriate seriousness, and has even accepted it as legitimate");

S.Rep. No. 101–545, at 38 (1990); Ewing, *supra*, at 15; Lamis Ali Safa, Note, *The Abuse Behind Closed Doors and the Screams That Are Never Heard*, 22 T. Marshall L.Rev. 281, 306–07 (1997).

**12.** Although the record suggests McDonald had a longer criminal history and had physically abused past girlfriends, it is silent as to whether the officers knew this. We do not consider this evidence in assessing the reasonableness of the officers' actions.

increase the short-term danger to abuse victims. *See Women and Violence: Hearings before the Comm. on the Judiciary, U.S. Senate, on Legislation to Reduce the Growing Problem of Violent Crime Against Women,* 101st Cong.2d 145 (1991) (statement of Susan Kelly–Dreiss, Executive Director, Pennsylvania Coalition Against Domestic Violence); Ewing, *supra,* at 13 ("Violence against battered women often escalates any time they attempt to take any control over their lives or the battering relationship."); Lenore E. Walker et al., *Beyond the Juror's Ken: Battered Women,* 7 Vt. L.Rev. 1, 12 (1982) ("One of the most dangerous times for both partners is at the point, or threat, of separation."). The officers also knew that McDonald was in violation of both the protective order and his bail conditions. His defiance of court orders, at the risk of going back to jail, suggested a man out of control or bent on revenge.

Fletcher's refusal to admit the officers and her denial that McDonald was in the home did not make the officers' conclusion that her safety was threatened unreasonable. Instead of opening the door and telling the officers that McDonald was there with her permission and was not threatening her safety, Fletcher ignored the knocking at her door and later lied about McDonald's presence. This gave them additional reason to fear for her safety, given their knowledge that McDonald had previously interfered with Fletcher's efforts to contact the police. In domestic violence situations, officers may reasonably consider whether the victim is acting out of fear or intimidation, or out of some desire to protect the abuser, both common syndromes. *See United States v. Bartelho,* 71 F.3d 436, 438 (1st Cir.1995) (noting that officers are often trained not to take the statements of abuse victims at face value, but instead to consider whether the victims

are acting out of fear). Indeed, one commentator has estimated that domestic violence victims are uncooperative in eighty to ninety percent of attempted criminal prosecutions against their batterers. *See* Lisa Marie De Sanctis, *Bridging the Gap Between the Rules of Evidence and Justice for Victims of Domestic Violence,* 8 Yale J.L. & Feminism 359, 367–68 (1996). This same commentator concluded that victims often lie "to minimize the violence and protect the batterer." *Id.* at 392 n. 197; *see also* Mary Ann Dutton, *Understanding Women's Responses to Domestic Violence: A Redefinition of Battered Woman Syndrome,* 21 Hofstra L.Rev. 1191, 1232–35 (1993). Particularly given their knowledge of the prior incidents between Fletcher and McDonald, the officers were not required to accept Fletcher's statements. Thus, the officers are entitled to qualified immunity as to the first entry.

The officers' second entry into Fletcher's home was also justified by the exigencies of the situation. When Genest entered Fletcher's home the second time, he knew that someone had locked him out. It was reasonable for him to believe that McDonald might have done so by reentering the home. And he knew that if McDonald had reentered the house, Fletcher would be vulnerable in her handcuffed position. Further, the situation had, at this point, escalated, increasing the possibility that McDonald might engage in violence.[13]

The Magistrate Judge, in denying summary judgment, found that the officers' "lack of haste" meant that exigent circumstances did not exist to justify the entries. In particular, he relied upon the fact that the officers learned around 6 p.m. that McDonald had been seen at Fletcher's home sometime in the last day or two, but did not go by her house until approximate-

---

**13.** Fletcher argues that the second entry is unlawful because the exigencies that justify it were of the officers' own making. This argument is to no avail. While Genest's handcuffing of Fletcher may have increased the poten-

tial for danger, he had no way of foreseeing that it might. And the primary causes of the exigency—namely, McDonald's escape from the house and Fletcher's locking of the door—were outside of his control.

ly 9 p.m.[14] This analysis ignores the fact that these officers did not themselves have any information that McDonald was still at the house and, thus, that Fletcher was in danger until they drove past her house at 9 p.m. At that point, they delayed only briefly to confirm that the protective order was in effect and to receive instructions from Trahan as to how they should proceed. The information that they received before they went on duty that evening— that McDonald had been seen in Fletcher's home, when she was not there, at some time during the last two days—did not create an exigency. The exigent circumstances arose when Genest and Bessey saw McDonald in the house with Fletcher, and they did not delay unreasonably in acting to address the safety risk they perceived at that time. *See United States v. Rengifo*, 858 F.2d 800, 804 (1st Cir.1988) ("An agent does not avoid or delay applying for a warrant if he or she is conducting an investigation spurred by suspicion, but without, in her reasonable judgment, sufficient evidence to establish probable cause to support a warrant.").

The officers are entitled to qualified immunity as to both entries, and thus to dismissal of these claims in Count I and Count II.

*B. The Warrantless Arrests*

■ Count I and Count II also allege that Fletcher's Fourth Amendment rights were violated when Genest arrested her. The gist of the complaint[15] seems to be that Genest lacked probable cause to arrest Fletcher and to charge her with hindering apprehension and escape. This question is somewhat closer than the wrongful entry claim.[16]

■ The law in this area is also clear. Warrantless arrests are permissible when supported by probable cause. *See Rivera v. Murphy*, 979 F.2d 259, 263 (1st Cir.1992). In turn, "probable cause exists when the facts and circumstances within [the police officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense." *Id.* (quoting *United States v. Figueroa*, 818 F.2d 1020, 1023 (1st Cir. 1987)) (internal quotation marks omitted) (alterations in original). Again, we turn to the second prong of the immunity analysis—whether an objectively reasonable officer would have found probable cause for the arrest.

■ Police are afforded immunity "so long as the presence of probable cause is at least arguable." *Floyd v. Farrell*, 765 F.2d 1, 5 (1st Cir.1985). Under this standard, Genest's arrest of Fletcher for hindering apprehension, while questionable, is not so unreasonable as to deprive him of qualified immunity. Fletcher's conduct brought her within the literal terms of Maine's hindering apprehension statute:

> 1. A person is guilty of hindering apprehension or prosecution if, with the intent to hinder, prevent or delay the discovery, apprehension, prosecution, conviction or punishment of another person for the commission of a crime, he:
>
> A. Harbors or conceals the other person; or
>
> . . .

14. The Magistrate Judge also found relevant the fact that Genest did not complete the paperwork associated with this incident that evening. This fact has no relevance to the question whether the officers acted as objectively reasonable officers would have in the circumstances facing them at the time.

15. The complaint also alludes to a possible claim of use of excessive force. There is, however, no evidence in the record to suggest that the amount of force used by Genest, if any, was unreasonable under the circumstances. *See Gaudreault v. Municipality of Salem*, 923 F.2d 203, 205 (1st Cir.1990).

16. The Magistrate Judge did not separately analyze the arrest, other than to note that his ruling that the officers should not have been in the home disposed of the issue.

E. Obstructs by force, intimidation or deception anyone from performing an act which might aid in the discovery, apprehension, prosecution or conviction of such person. . . .

Me.Rev.Stat. Ann. tit. 17–A, § 753. Fletcher's own testimony is that she lied to the officers and said McDonald was not in the house or in the bathroom. Her actions, therefore, fit within the statutory language.

It is important to note that Fletcher's refusal to let the officers into her house cannot serve as the justification for her arrest. Fletcher says that Genest threatened her with arrest if she denied them access to the house so that they could arrest McDonald. If that were the justification for Fletcher's arrest, that arrest would be in clear violation of the Fourth Amendment. That is not this case, however.

Fletcher also complains that the officers lacked probable cause to arrest her for escape, which requires that she "without official permission . . . intentionally leaves official custody. . . ."[17] Me.Rev.Stat. Ann. tit. 17–A, § 755(1). This charge was based on Fletcher's slipping out of the handcuffs and locking the door behind the officers. While it is unclear precisely when Genest charged Fletcher with the crime of escape, it is clear that this charge was made sometime after Fletcher was handcuffed for the second time. But we need not consider whether the officers had probable cause to arrest Fletcher for escape. In handcuffing Fletcher for the second time, Genest was doing no more than bringing her back into lawful custody.

Her initial arrest for hindering apprehension was supported by probable cause and Fletcher has not provided, nor have we found, any cases suggesting that a later charge may in any way affect the lawfulness of the initial arrest. *Cf.* 1 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 3.5, at 243 (1984) (stating generally that "the lawfulness of the arrests should be determined upon the basis of the facts at hand when they were made and not because of the characterization employed"); *Sheehy v. Town of Plymouth,* 191 F.3d 15, 17 (1st Cir.1999). The charge of escape did not result in a violation of her clearly established constitutional rights, and the officers are, therefore, protected by qualified immunity.[18]

## C. *The Bail Proceedings*

 Count III of Fletcher's complaint alleges constitutional violations stemming from the process by which her bail conditions were determined. The defendants have not challenged on appeal the Magistrate Judge's denial of summary judgment on this Count. Defendants stated at oral argument that they did not consider the Magistrate Judge to have issued a final ruling on this portion of their motion for summary judgment because the opinion's legal analysis focused almost entirely on the officers' qualified immunity as to the claimed Fourth Amendment violations. Regardless, the Magistrate Judge clearly disposed of the summary judgment motion as to Count III, stating in his opinion that "Defendants' Motion for Summary Judgment is hereby GRANTED as to Counts IV through IX, and DENIED as to Counts

17. Fletcher asserts in her brief that she was charged with Class B escape, which requires that the escape be "committed by force against a person, threat of such force, or while the defendant is armed with a dangerous weapon." Me.Rev.Stat. Ann. tit. 17–A, § 755(4)(A). Because the lawfulness of Fletcher's arrest does not hinge on the escape charge, this factual discrepancy is immaterial.

18. To the extent that Fletcher complains about the charge itself, rather than any effect

that charge had on the lawfulness of her arrest, she again fails to make out a constitutional violation. Her allegations fall short of a claim for malicious prosecution. *See Torres v. Superintendent of Police,* 893 F.2d 404, 409 (1st Cir.1990)(concluding that a claim of "filing of a baseless charge and nothing more" is only actionable under § 1983 where "the malicious conduct was so egregious that it violated substantive or procedural due process rights under the Fourteenth Amendment").

I through III." Thus, the defendants have waived their right to appeal the denial of qualified immunity as to Count III. *See United States v. Slade*, 980 F.2d 27, 30 n. 3 (1st Cir.1992) ("[T]heories neither briefed nor argued on appeal are deemed to have been waived.").

### D. The Municipal Defendant

The Town of Clinton also appeals from the denial of summary judgment. The Town seems to assume that it either has qualified immunity or gets the benefit of the individual officers' qualified immunity. The Magistrate Judge took a similar approach, dismissing the Town's motion for summary judgment by relying on his qualified immunity analysis.

Fletcher does not make a separate argument of lack of jurisdiction over the Town's appeal. If, of course, the denial of summary judgment was based on immunity grounds, there would be appellate jurisdiction. But both the Magistrate and Town are wrong to view this in immunity terms.

■■■■ To the extent there is a question as to whether we have appellate jurisdiction, we exercise very limited pendent jurisdiction. Both the parties and the Magistrate Judge demonstrate that the decision on the Town's motion for summary judgment was "inextricably intertwined with that court's decision to deny the individual defendants' qualified immunity motions." *Swint v. Chambers County Comm'n*, 514 U.S. 35, 51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995); *see also Mattox v. City of Forest Park*, 183 F.3d 515, 524 (6th Cir.1999). Because pendent jurisdiction is discouraged, *see, e.g., Roque–Rodriguez v. Lema Moya*, 926 F.2d 103, 105 & n. 2 (1st Cir. 1991) (noting that restrictions on pendent jurisdiction are "self-imposed" and mean that "interlocutory review of a qualified immunity order does not in and of itself confer jurisdiction over other contested issues in the case"), we assume jurisdiction over this claim only to vacate the Magistrate Judge's denial of the Town's motion for summary judgment and remand for full consideration of the issues raised by the Town's motion.

■■■■ The Magistrate Judge's resolution of the officers' request for qualified immunity did not dispose of the Town's motion for summary judgment. A municipality's position in a § 1983 suit differs from that of the individual defendants in two key ways. First, the municipality enjoys no immunity from damages liability under § 1983. *See Owen v. City of Independence*, 445 U.S. 622, 657, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). This means that it is "not impossible for a municipality to be held liable for the actions of lower-level officers who are themselves entitled to qualified immunity." *Joyce*, 112 F.3d at 23. Second, a municipality cannot be held liable under a respondeat superior theory. *See Monell v. Department of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). This means that even if the individual defendants are liable, the municipality may not be. Something more than liability on the part of the individual defendants must be shown to impose liability on the municipality. A plaintiff seeking damages against the municipality must show that "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers" or is "pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690, 691, 98 S.Ct. 2018. If the allegation against the municipality involves a failure to train, the plaintiff must put forth evidence of a failure to train that amounts to "deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Finally, plaintiffs must show a direct causal link between the municipal action and the deprivation of federal rights. *See Board of the County Comm'rs v. Brown*, 520 U.S.

397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

For these reasons, motions for summary judgment brought by individual defendants and municipalities often involve distinct legal issues. This is particularly true when, as in this case, the resolution of the officers' claim for qualified immunity hinges on a court's decision that the law was clearly established at the time. While a finding that the law was not clearly established may foreclose municipal liability for failure to train, *see Joyce,* 112 F.3d at 23, a finding that the law was clearly established does not dispose of the municipality's motion for summary judgment. Rather, the court must go on to consider whether allegations of a municipal policy or practice have been made that are sufficient to survive summary judgment.

The Magistrate Judge incorrectly conflated the issues involved in the motion for summary judgment brought by the Town and the individual defendants. We vacate the denial of summary judgment as to the Town and remand for consideration of the remaining issues.[19]

## V

Accordingly, we *affirm in part* and *reverse in part* the Magistrate Judge's denial of the motion for summary judgment as to the individual defendants, and instruct that Counts I and II against the officers be dismissed. We *vacate* the denial of the Town's motion for summary judgment and *remand* for proceedings consistent with this decision.

**19.** The Magistrate may wish to require further briefing in light of the evident confusion.