2005 UT 13

**BRIGHAM CITY, Plaintiff and Petitioner,**

v.

**Charles W. STUART, Shayne R. Taylor and Sandra A. Taylor, Defendants and Respondents.**

No. 20021004.

Supreme Court of Utah.

Feb. 18, 2005.

Rehearing Denied July 18, 2005.

Mark L. Shurtleff, Att'y Gen., Jeffrey S. Gray, Asst. Att'y Gen., Salt Lake City, Leonard J. Carson, Brigham City, for petitioner.

Rod Gilmore, Layton, for respondent.

NEHRING, Justice:

¶1 We granted certiorari to review the court of appeals's affirmance of the trial court's order granting defendants Charles Stuart and Shayne and Sandra Taylor's motion to suppress evidence obtained during a warrantless entry into a home. The single issue we are called upon to decide is whether the court of appeals properly affirmed the trial court's determination that the warrantless entry was not supported by exigent circumstances and was, therefore, unlawful. We conclude that the court of appeals was correct and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

¶2 Four Brigham City police officers responded to a complaint of a loud party. They arrived at the offending residence at about three o'clock in the morning. They traveled to the back of the house to investigate the noise. From a location in the driveway, the officers peered through a slat fence and observed two apparently underage males drinking alcohol. The officers then entered the backyard through a gate, thereby obtaining a clear view into the back of the house through a screen door and two windows. The officers saw four adults restraining one juvenile. The juvenile broke free, swung a fist and struck one of the adults in the face. Two officers then opened the screen door and "hollered" to identify themselves. When no one heard them, they entered the kitchen. After entering, one of the officers again shouted to identify and call attention to him-

---

1. Search and seizure cases are "highly fact dependant." *State v. Warren*, 2003 UT 36, ¶2, 78 P.3d 590. Therefore, the trial court's factual findings are supplemented with relevant, objective facts gleaned from testimony given during the evidentiary hearing that was held on March 22, 2001.

self. As those present in the kitchen became aware of the officers, they became angry that the officers had entered the house without permission.

¶ 3 The officers subsequently arrested the adults. They were charged with contributing to the delinquency of a minor, disorderly conduct, and intoxication. The defendants filed a motion to suppress which gave rise to this petition.

¶ 4 The trial court entered the following findings of fact in support of its order granting the motion to suppress:

"1. On July 23, 2001, at approximately 3:00 a.m., four Brigham City Police officers were dispatched ... as a result of a call concerning a loud party.

2. After arrival at the residence, the officers, from their observations from the front of the residence, determined that it was obvious that knocking on the front door would have done no good. It was appropriate that they proceed down the driveway alongside the house to further investigate.

3. After going down the driveway on the side of the house, the officers could see, through a slat fence, two juveniles consuming alcoholic beverages. At that point, because of the juveniles, there was probable cause for the officers to enter into the backyard.

4. Upon entering the backyard, the officers observed, through windows and a screen door an altercation taking place, wherein it appeared that four adults were trying to control a juvenile. At one point, the juvenile got a hand loose and smacked one of the occupants of the residence in the nose.

5. At that point in time, the court finds no exigent circumstances to justify the officers' entry into the residence. What he should have done, as required under the 4th amendment, was knock on the door. The evidence is that there was a loud, tumultuous thing going on, and the evidence is that the occupants probably would not have heard, but under the 4th amendment he has an obligation to at least attempt before entering."

*Brigham City v. Stuart,* 2002 UT App 317, ¶ 12, 57 P.3d 1111 (quoting trial court order).

¶ 5 The court of appeals determined that Brigham City had not challenged the trial court's findings of fact and denied an attempt by Brigham City to supplement the factual findings. *Id.* at ¶ 6. The court of appeals adopted the facts as found by the trial court and based its holding on them. *Id.*

¶ 6 Brigham City has urged us to expand our review of the facts to include all of the evidence received at the suppression hearing. Brigham City did not, however, ask us to review the court of appeals's denial of its attempt to expand the scope of reviewable facts. We therefore confine the factual component of our review to the facts considered by the court of appeals.

## STANDARD OF REVIEW

¶ 7 When reviewing cases under certiorari jurisdiction, we apply a standard of correctness to the decision made by the court of appeals rather than the trial court. *State v. Warren,* 2003 UT 36, ¶ 12, 78 P.3d 590. However, the ultimate question of whether a particular set of facts satisfies a given legal standard is a mixed question of law and fact. *State v. Pena,* 869 P.2d 932, 936 (Utah 1994).

¶ 8 We recently announced our intention to review for correctness mixed questions of law and fact in search and seizure cases and to undertake this task based on a totality of the circumstances. *State v. Brake,* 2004 UT 95, ¶ 15, 103 P.3d 699. In *Brake,* we cited a desire to develop uniform search and seizure standards to aid law enforcement officers as the reason for adopting a less deferential standard when reviewing whether a particular set of facts surrounding a warrantless search or seizure offended constitutional protections. *Id.* at ¶ 14. The court of appeals issued its opinion in this case before we modified the standard of review in *Brake.* Although we conduct our review under the standard announced in *Brake,* we nevertheless reach the same conclusion that the court of appeals reached under its "measure of deference" standard.

¶ 9 The accuracy of the subsidiary facts relied upon by the court of appeals was

unchallenged. Our review is therefore limited to the correctness of the legal conclusion reached by the trial court and ratified by the court of appeals that no exigent circumstances justified the officers' entry into the home.

¶ 10 Our aspiration to provide useful guidance to those charged with the day-to-day responsibility of putting search and seizure law into practice is handicapped by the manner in which search and seizure cases are presented to us. This case, like *Brake* and an array of its search and seizure predecessors,[2] either does not raise or inadequately briefs a state constitutional claim. The reluctance of litigants to take up and develop a state constitutional analysis is surprising in light of our repeated statements that federal Fourth Amendment protections may differ from those guaranteed our citizens by our state constitution. *See, e.g., State v. DeBooy*, 2000 UT 32, ¶ 12, 996 P.2d 546 ("While this court's interpretation of article I, section 14 has often paralleled the United States Supreme Court's interpretation of the Fourth Amendment, we have stated that we will not hesitate to give the Utah Constitution a different construction where doing so will more appropriately protect the rights of this state's citizens."); *State v. Watts*, 750 P.2d 1219, 1221 n. 8 (Utah 1988) ("[C]hoosing to give the Utah Constitution a somewhat different construction may prove to be an appropriate method for insulating this state's citizens from the vagaries of inconsistent interpretations given to the fourth amendment by the federal courts."); *State v. Hygh*, 711 P.2d 264, 271–73 (Utah 1985) (Zimmerman, J., concurring) (stating that state and federal search and seizure law are not identical).

¶ 11 In *Brake*, for example, we took issue with the usefulness of federal Fourth Amendment jurisprudence concerning the police officer safety justification for warrantless automobile searches. *Brake*, 2004 UT 95 at ¶¶ 27–31, 103 P.3d 699. Our reasoning in *Brake* emanated to a great extent from cases in which we concluded that article I, section 14 of the Utah Constitution provides a greater expectation of privacy than the Fourth Amendment as interpreted by the United States Supreme Court.

¶ 12 Where the parties do not raise or adequately brief state constitutional issues, our holdings become inevitably contingent. They carry within them an implicit qualification that if properly invited to intervene, our state's Declaration of Rights might change the result and impose different demands on police officers and others who in a very real sense are the everyday guardians of constitutional guarantees against unreasonable searches and seizures.

¶ 13 In the not so distant history of this court, we engaged in an ongoing and robust discussion over whether and to what extent we should defer to the federal courts when called upon to interpret provisions of our Declaration of Rights, which parallel the federal Bill of Rights. *State v. Anderson*, 910 P.2d 1229, 1234–42 (Utah 1996); *State v. Poole*, 871 P.2d 531, 534–36 (Utah 1994); *State v. Larocco*, 794 P.2d 460, 465–71 (Utah 1990). In *Anderson*, we counseled against departing from the guidance from federal courts except when "compelling circumstances" required it. 910 P.2d at 1235. To do otherwise would cause unnecessary confusion and undercut the policy objective of giving clear direction to judges and law enforcement officials. *Id.* Justice Stewart in his concurrence cautioned against unquestioning fealty to federal precedent on matters of individual liberty. *Id.* at 1240. He defended his view by noting that "[t]he framers of the Utah Constitution necessarily intended that this Court should be both the ultimate and final arbiter of the meaning of the provisions in the Utah Declaration of Rights and the primary protector of individual liberties." *Id.*

¶ 14 The debate over the proper relationship between the Bill of Rights and Declaration of Rights has lain dormant for almost a decade. This lull does not signal resolution of the matter. The mere passage of time and the accumulation of decisions issued by this court on appeals brought solely on

---

2. *E.g., State ex rel. A.C.C.*, 2002 UT 22, 44 P.3d 708; *State v. Norris*, 2001 UT 104, 48 P.3d 872; *State v. Bisner*, 2001 UT 99, 37 P.3d 1073.

Fourth Amendment grounds may, however, ultimately overpower the merits of an independent analysis of search and seizure law under our Declaration of Rights. It would be unfortunate, indeed, if such a de facto abdication of our responsibility as guardians of the individual liberty of our citizens were to occur. Because we are resolute in our refusal to take up constitutional issues which have not been properly preserved, framed and briefed, *State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346; *State v. Lopez*, 886 P.2d 1105, 1113 (Utah 1994), we are once again foreclosed from undertaking a principled exploration of the interplay between federal and state protections of individual rights without the collaboration of the parties to an appeal. This collaborative effort should be renewed.

## ANALYSIS

¶ 15 The right to be free of unreasonable searches and seizures is one of the most cherished rights guaranteed by the Utah and United States Constitutions. *State v. Trane*, 2002 UT 97, ¶ 21, 57 P.3d 1052. The Fourth Amendment to the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV. A "cardinal principle" derived by this language is that warrantless searches " 'are *per se* unreasonable under the Fourth Amendment.' " *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). Nowhere is this principle more zealously guarded than in a person's home, which is one of four domains expressly granted the security promised by the Fourth Amendment. The Supreme Court has interpreted the Fourth Amendment as "draw[ing] 'a firm line at the entrance to the house,' " *Kyllo v. United States*, 533 U.S. 27, 40, 121

S.Ct. 2038, 150 L.Ed.2d 94 (2001) (quoting *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)), where even an "officer who barely cracks open the front door and sees nothing" is deemed to have violated its venerable protections, *id.* at 37, 121 S.Ct. 2038.

¶ 16 Even this most highly protected realm may, however, be subject to intrusion in exceptional circumstances where "the needs of law enforcement [are] so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey*, 437 U.S. at 394, 98 S.Ct. 2408. We have acknowledged that the requisite compelling need to enter a dwelling exists in the presence of probable cause and exigent circumstances. *State v. Ashe*, 745 P.2d 1255, 1258–59 (Utah 1987). Probable cause exists where the facts that an officer has acquired from reasonably trustworthy sources are sufficient to permit a reasonably cautious person to believe that an offense has been, or is being, committed. *State v. Dorsey*, 731 P.2d 1085, 1088 (Utah 1986).

¶ 17 Here, the officers' observation of the consumption of alcohol by underage youths and the blow struck by the juvenile in the kitchen of the dwelling were sufficient to establish probable cause and thus are not at issue. Brigham City instead challenges the court of appeals's determination that exigent circumstances did not exist.

¶ 18 The court of appeals has correctly characterized exigent circumstances as "those 'that would cause a reasonable person to believe that [immediate] entry ... was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.' " *State v. Beavers*, 859 P.2d 9, 18 (Utah Ct. App.1993) (quoting *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir.1984)).

¶ 19 Among the categories of possible exigent circumstances, only one is relevant here: whether the altercation within the dwelling and the blow struck by the juvenile could give rise to the officers' reasonable belief that their immediate entry was neces-

sary to prevent physical harm to the occupants of the house. With this refinement of our inquiry, we confront the nub of the matter: how grave must the impending harm be to create an exigent circumstance? According to Brigham City, the answer to this question is "not very." Brigham City insists, not implausibly, that it would "defy reason to suppose that peace officers must secure a warrant or consent before entering a house to break up a fight." Brigham City finds support for this view in the observation of Judge Bench in his dissenting opinion that "[i]t is nonsensical to require officers, charged with keeping the peace, to witness this degree of violence and take no action until they see it escalate further." *Brigham City v. Stuart*, 2002 UT App 317, ¶ 20, 57 P.3d 1111.

¶ 20 Such. a restraint on police officer intervention would almost certainly justify the label "nonsensical" were it to describe a melee in the street or another venue unguarded by the Fourth Amendment. However, that the intrusion in question occurred within the confines of a dwelling is the unique fact that sets two forces on a collision course: the constitutional protections afforded houses, and our societal commitment to the peacekeeping mission of law enforcement officials. It is these two forces that must be balanced in assessing the reasonableness of an officer's warrantless entry into a home.

¶ 21 Brigham City presents us with two primary arguments, both of which were endorsed in Judge Bench's dissenting opinion below, *Stuart*, 2002 UT App 317 at ¶¶ 17–22, 57 P.3d 1111. First, Brigham City argues that a showing of exigent circumstances was unnecessary because the entry could have been alternatively justified under the emergency aid doctrine. *See id.* at ¶ 19 n. 1 ("The officers might also have been justified in entering the residence pursuant to the emergency aid doctrine, a variant to the exigent circumstances exception."). Second, Brigham City argues that the facts of this case were sufficient to present exigent circumstances. *Id.* at ¶ 21. In reaching this same conclusion, Judge Bench compared the facts in *Stuart* to those in *State v. Comer*, 2002 UT App 219, 51 P.3d 55, a court of appeals case

affirming the lawfulness of an entry into a home by officers responding to a call that a family fight was in progress, and concluded that here, greater evidence of actual or threatened harm likewise justified a warrantless entry of the house. *Stuart*, 2002 UT App 317 at ¶¶ 17–19, 57 P.3d 1111. Judge Bench rejected the majority's assertion that *Comer* was narrowly applicable to warrantless entries based on evidence of domestic violence. *Id.* at ¶ 20. We address each of Brigham City's arguments in turn.

## I. EMERGENCY AID DOCTRINE

¶ 22 Under the emergency aid, or medical emergency, doctrine, law enforcement officers may enter a dwelling without a warrant. The emergency aid doctrine strikes a balance between the rights protected by the Fourth Amendment and the interests of government to access a dwelling to safeguard the well-being of citizens. The doctrine permits police to make "warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid ... [because] '[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'" *Mincey*, 437 U.S. at 392, 98 S.Ct. 2408 (quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C.Cir.1963)); *see also State v. Frankel*, 179 N.J. 586, 847 A.2d 561, 568 (2004) ("The emergency aid doctrine is derived from the commonsense understanding that exigent circumstances may require public safety officials, such as the police ... to enter a dwelling without a warrant for the purpose of protecting or preserving life, or preventing serious injury."). The purpose and motivation for actions performed under the emergency aid doctrine distinguish them from conduct subject to constitutional oversight. Officers who render emergency aid are not serving as peacekeepers or in a law enforcement capacity, but rather as caretakers.

¶ 23 Utah courts have adopted a three-prong test that renders a warrantless search lawful under the emergency aid doctrine when the following conditions are met:

"(1) Police have an objectively reasonable basis to believe that an emergency exists and believe there is an immediate need for their assistance for the protection of life.

(2) The search is not primarily motivated by intent to arrest and seize evidence.

(3) There is some reasonable basis to associate the emergency with the area or place to be searched."

*Comer*, 2002 UT App 219 at ¶ 5 n. 1, 51 P.3d 55 (quoting *Salt Lake City v. Davidson*, 2000 UT App 12, ¶ 12, 994 P.2d 1283). Because officers who act under the emergency aid doctrine are not conducting a law enforcement mission, they may do so without either obtaining a warrant or demonstrating the presence of probable cause or exigent circumstances.

¶ 24 To reduce the likelihood of misuse of the emergency aid doctrine as a less demanding substitute for a warrant or the more traditional justifications for a warrantless search, the emergency aid entry is justified only where there is "some reliable and specific indication of the probability that a person is suffering from a *serious* physical injury." *Id.* at ¶ 20 (emphasis added). This standard has been further refined to require an "objectively reasonable belief that an unconscious, semi-conscious, or missing person feared injured or dead" is in the home. *Id.* at ¶ 19. Furthermore, because of the emergency aid doctrine's link to a police officer's caretaking, it may be invoked only when the purpose of the intrusion is to "enhance the prospect of administering appropriate medical assistance, and the rationale is that the need to protect life or avoid serious injury to another is paramount." Tracy A. Bateman, Annotation, *Lawfulness of Search of Person or Personal Effects Under Medical Emergency Exception to Warrant Requirement*, 11 A.L.R.5th 52 § 2(a); *see also Frankel*, 847 A.2d at 569 (test under emergency aid doctrine states that the public safety official's "primary motivation for entry into the home must be to render assistance").

¶ 25 What the content and rationale of the emergency aid doctrine make clear is that, notwithstanding a generalized desire or expectation that police officers can and will intervene to aid those who suffer injury, the value we place on constitutional protections afforded a dwelling imposes a heightened threshold on the degree of actual or impending harm which will justify such an intrusion. Consequently, intrusions to administer aid to less severe injuries may render unconstitutional a search or seizure made incident to the warrantless entry.

¶ 26 The balancing of interests that informs the emergency aid doctrine does not, contrary to Brigham City's assertion, sanction the entry into the defendants' residence. The magnitude of the harm fell short of the serious bodily injury threshold necessary to access the emergency aid doctrine. The factual findings to which Brigham City stipulated indicate only that "[a]t one point, the juvenile got a hand loose and smacked one of the occupants of the residence in the nose." *Stuart*, 2002 UT App 317 at ¶ 12, 57 P.3d 1111. The findings of fact disclose nothing to indicate that the officers found it necessary to render medical assistance to the victim of the juvenile's blow or otherwise minister to an injury of the severity necessary to support the invocation of the emergency aid doctrine.[3] Instead, the record reveals that the officers acted exclusively in their law enforcement capacity, arresting the adults for alcohol related offenses, and providing no medical assistance whatsoever.

¶ 27 We recognize that upon entering a residence, an officer may encounter unanticipated circumstances that may heighten or diminish the nature of the emergency that initially prompted officers to enter a dwelling. However, in this case, the officers had a clear view of the interior of the house from their position in the backyard. Any evidence that existed to support an emergency aid entry was acquired by the officers from their position outside the house and not from de-

---

**3.** The facts of this case are similar to those in *People v. Allison*, 86 P.3d 421, 423–24 (Colo. 2004), wherein the police responded to a 911 hang-up call, removed a married couple with slight facial injuries, and then re-entered their residence to look for other victims. In holding that the emergency aid doctrine did not apply, the court found it significant that the police did not ask the couple if anyone needed medical assistance before entering the home. *Id.* at 429.

velopments in the altercation that occurred after they entered the kitchen. Therefore, the circumstances known to the officers at the time of entry did not create a reasonable belief that emergency aid was required.

## II. EXIGENT CIRCUMSTANCES DOCTRINE

¶ 28 We next turn to the question of whether the officers' intrusion was justified as a law enforcement activity undertaken pursuant to exigent circumstances. The level of harm necessary to invoke the emergency aid doctrine clearly satisfies the exigent circumstances standard. *See United States v. Holloway*, 290 F.3d 1331, 1337 (11th Cir. 2002) ("[W]e conclude emergency situations involving endangerment to life fall squarely within the exigent circumstances exception."). The question we confront here, however, is whether some lesser actual or threatened harm than that required to justify an emergency aid intrusion will support a warrantless search based on exigent circumstances and, if it can, whether the conduct which stimulated the Brigham City officers to enter the residence meets this standard. We conclude that although the range of actual or imminent injury that will support an exigent circumstances intrusion is more expansive than that available under the emergency aid doctrine, the court of appeals correctly held that exigent circumstances did not justify the Brigham City officers' warrantless intrusion.[4]

¶ 29 The primary rationale for permitting police officers greater latitude in justifying an exigent circumstances intrusion than an emergency aid intrusion flows from the different role assumed by officers acting in the face of exigent circumstances. Officers who act in the face of exigent circumstances are pursuing a law enforcement mission, not acting as caretakers. Although this classification scheme is artificial and simplistic, representing just two of many roles that trained police officers integrate confidently and intuitively in their professional lives, it does provide a useful tool to help understand and evaluate warrantless intrusions. It is the presence or absence of probable cause that gives analytical direction to whether a police officer entering a home without a warrant has done so as a caretaker under the emergency aid doctrine or in a law enforcement capacity under the exigent circumstances standard.

¶ 30 To justify a warrantless entry based on exigent circumstances, a reasonable person must believe that the entry "was necessary to prevent physical harm to the officers or other persons." *Beavers*, 859 P.2d at 18. This standard demands a lesser degree of harm or threat of harm than that necessary to invoke the emergency aid doctrine. The distinction between the approaches to harm taken by the emergency aid and exigent circumstances doctrines is evident from the inclusion of officer safety as a consideration in passing judgment on an entry justified as an exigent circumstance. An officer who acts in a caretaker capacity when providing emergency aid is not likely to expose himself to the risk of harm. The sole consideration is the well being of persons inside a dwelling who are entitled to privacy, but who also may be in dire need of aid.

¶ 31 The same cannot be said for the officer faced with probable cause that a crime has been committed. Officer safety is of concern whenever an officer acts in his law enforcement role. The degree of potential harm to an officer that is necessary to create an exigent circumstance is minimal, reflecting the high value we place on the security of peace officers. *See State v. James*, 2000 UT 80, ¶ 10 n. 3, 13 P.3d 576 (citing *Knowles v. Iowa*, 525 U.S. 113, 117–18, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998)) (noting that the threat to an officer's safety in a routine traffic stop is significantly less than in a custodial arrest, but nevertheless high enough to merit asking the driver to step out of the vehicle).

¶ 32 The safety of the Brigham City officers is not at issue here. The sole justification for the warrantless entry was the safe-

---

4. The court of appeals appears to have applied a threshold of harm under the exigent circumstance doctrine similar to that required to justify an emergency aid intrusion when it observed that the trial court made no findings to support "an immediate serious threat or ... a threat of escalating violence." *Stuart*, 2002 UT App 317 at ¶ 13, 57 P.3d 1111.

guarding of the inhabitants of the dwelling. The rationale for the reduced quantum of harm necessary to justify an exigent circumstance intrusion for the officer does not extend to the inhabitants of a home. Our respect for officer safety flows from our recognition of the dangers inherent in law enforcement. However, the license extended to law enforcement to protect themselves from harm does not apply when the "other persons" covered by the *Beavers* articulation of the exigent circumstances standard are the inhabitants of a dwelling. Unlike law enforcement officers, the inhabitants own the right to be free in their homes from unreasonable searches and seizures. They may well choose to expose themselves to greater actual or potential harm to preserve their right to be left alone in their homes. They may even engage in acts that meet the legal definition of assault, thereby creating probable cause, but that nevertheless do not create an exigent circumstance authorizing a warrantless intrusion.

¶ 33 Although linked in the *Beavers* formulation of exigent circumstances, law enforcement officers and inhabitants of dwellings do not share the same threshold of harm necessary to justify a warrantless entry based on exigent circumstances because each possesses different and distinct interests. To the inhabitant of a dwelling who, unlike the law enforcement officer, does not face the reality of danger as a constant workday presence, the warrantless intrusion of a law enforcement officer may be an unwelcome invasion of privacy, even if the inhabitant has sustained an injury. Consequently, the difference between the quantum of harm necessary to invoke the emergency aid and exigent circumstances doctrines is greatest when probable cause is present and a law enforcement officer is exposed to risk, but is of lesser magnitude when the threat of harm is to the inhabitant of the dwelling.

¶ 34 Here the Brigham City officers entered the home after witnessing four adults attempt to restrain a juvenile, the juvenile break a hand free and strike an adult in the face, and the adults struggle to regain control of the juvenile. When, after entering the kitchen of the house, the officer gained the attention of its occupants the altercation abated. It was the acknowledged presence of the authority of the police that quenched the heat in the kitchen.

¶ 35 The degree of harm suffered by the adult victim of the juvenile's blow certainly nudges the line of that degree of harm sufficient to create an exigent circumstance. The restraint of the juvenile by the adults, both before and after the blow was struck, is less worthy of justifying an exigent circumstance, but underscores the reality that this case presents us with a close and difficult call. The efforts by the adults to control the juvenile certainly met the legal definition of an assault. If all that were required to authorize a warrantless entry into a home was probable cause that an assault of any severity whatsoever had occurred within the dwelling, the exigent circumstance component of the doctrine would disappear, subsumed within the probable cause requirement.[5] The record reveals that the police officers heard the adults couple their efforts to physically restrain the juvenile with demands that he "calm down." The scene that played out before the officers prior to their entry into the kitchen was one in which the unanswered question was not whether the occupants of the kitchen were going to escalate the violence but instead whether the adults would be successful in accomplishing their goal of subduing the juvenile.

¶ 36 It is reasonable to believe that while still outside the house the police officers understood that a display of official authority would likely have the desired effect of restoring peace. That is in fact what occurred after the police entered the house. The spreading awareness of police presence ended the confrontation between the adults and the juvenile. As noted by the trial court, the officers made no attempt to knock before entering. While the trial court noted further that owing to the noise and tumult in the kitchen a knock "probably would not have

5. The nature of a crime or suspicion of criminal activity creating probable cause can, however, contribute to establishing exigent circumstances.

*State v. Schlosser*, 774 P.2d 1132, 1137 (Utah 1989) (citing *United States v. Hensley*, 469 U.S. 221, 226, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)).

been heard," the officers nevertheless gave no thought to the constitutional implications associated with where they announced their presence. On the July night of the incident, only a screen door separated the officers from the kitchen. We are left to speculate, although our foray into speculation is appropriate here, whether the officers could have achieved the two-fold objective of quelling the disturbance by making their presence known and honoring the constitutional integrity of the dwelling.

¶ 37 Our task is to pass judgment on whether the intrusion was reasonable taking into account all the circumstances. *Pennsylvania v. Mimms,* 434 U.S. 106, 109, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (citing *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). When it singled out for criticism the officers' failure to knock in advance of entering the dwelling, the trial court was not attempting to balance its ruling atop a slender and fragile legal technicality. It was, instead, securing its decision to the sturdier foundation of the deeply rooted constitutional and statutory [6] dignity afforded a dwelling. We therefore agree with the court of appeals and the trial court that the Brigham City officers entered the dwelling without aid of an exigent circumstance.

¶ 38 In considering the exigent circumstances doctrine, the court of appeals split over the applicability of its opinion in *State v. Comer,* 2002 UT App 219, 51 P.3d 55, to the Brigham City intrusion. *Stuart,* 2002 UT App 317, 57 P.3d 1111. In *Comer,* police officers responded to a citizen's report of a domestic fight. *Comer,* 2002 UT App 219 at ¶ 2, 51 P.3d 55. A female occupant of the residence answered the officers' knock on the door. *Id.* The occupant stepped onto the porch, where the officers explained why they were there. *Id.* After telling the officers that her husband was inside the home, the occu-

pant "immediately turned and walked back inside the residence." *Id.* The officers followed and came upon the husband who had scratch marks on his upper body. *Id.* at ¶ 3. The court of appeals affirmed the trial court's finding of exigent circumstances. *Id.* at ¶ 27.

¶ 39 Judge Bench's dissent in *Stuart* found *Comer* to be controlling. *Stuart,* 2002 UT App 317 at ¶ 17, 57 P.3d 1111. The majority limited *Comer's* reach to "domestic violence" situations. *Id.* at n. 2. Judge Bench found this to be an unsatisfying distinguishing characteristic. *Id.* at ¶ 20. According to him, it makes little sense to hold police officers to a dual standard, barring an intrusion into a home when conduct amounting to an assault occurs between persons who do not meet the definition of "cohabitants," but permitting it when they do. *Id.* He implies that since assaultive conduct within a home will frequently be accompanied by ambiguity over its status as "domestic violence," all assaults which occur within a home should be presumed to be between cohabitants and therefore police officers who respond to them should be entitled to access the home under the exigent circumstance analysis which sanctioned the intrusion in *Comer. Id.*[7]

¶ 40 Although we express no view on whether *Comer* was correctly decided, we note the Fourth Amendment protections afforded a dwelling and the unquestioned evils of domestic violence are powerful forces pulling a police officer standing on the threshold of a home in opposite directions: the Fourth Amendment pushing him toward a magistrate and a warrant, domestic violence drawing him through the door to intervene in one of the most common and volatile settings for serious injury or death. We are wary of making sweeping pronouncements in the face of these important, but contradictory, con-

---

6. *See* Utah Code Ann. § 77–7–8 (2003) (officer must demand admission and explain purpose for entering before making a forcible entry to a building or dwelling in order to arrest an occupant) and § 77–23–210 (2003) (officer must give notice of authority and purpose before executing search warrant).

7. The Utah Legislature has defined "domestic violence" as "any criminal offense involving vio-

lence ... when committed by one cohabitant against another." Utah Code Ann. § 77–36–1(2) (2003). By this definition, any altercation taking place within a home may result in a reasonable belief that the participants are cohabitants committing domestic violence. This interpretation would appear to be consistent with the elevated status of domestic violence as an exigent circumstance advanced by Judge Bench in his dissent.

cerns. We also decline to signal our approval for any categorical extension of the exigent circumstances which would permit a warrantless entry into a home, even where to do so may prove beneficial in controlling the scourge of domestic violence, because a categorical extension would unduly threaten the special protection the Fourth Amendment bestows on people in their homes.

¶ 41 Moreover, *Comer* differs factually from this case in one significant respect not addressed by the court of appeals. The single fact that tipped the balance in favor of concluding that the *Comer* intrusion was reasonable and justified as an exigent circumstance was the abrupt and unexplained re-entry into the home by the female occupant after she had been made aware of the fact of and purpose for the police officers' presence at her home. *See* 2002 UT App 219 at ¶ 26, 51 P.3d 55 (noting that the female occupant's re-entry may have indicated to the officers that any number of situations was about to occur, including the continuation of the altercation or an attempt to cover up evidence). The court of appeals surmised that the female's odd behavior reasonably heightened the officers' suspicions that her retreat into the dwelling would be followed by the commission of a domestic assault. *Id.* In contrast, the officers in this case could not assess whether assaultive behavior would continue after their presence was made known to the occupants of the dwelling before entering the kitchen because they made no effort to announce their presence.

¶ 42 In *Mincey,* the United States Supreme Court struck down Arizona's murder scene exception—a *per se* rule permitting warrantless searches whenever a homicide is committed. 437 U.S. at 395, 98 S.Ct. 2408 ("[A] warrantless search . . . [was] not constitutionally permissible simply because a homicide had recently occurred."); *see also Payton,* 445 U.S. at 590, 100 S.Ct. 1371 (exigent circumstances required to cross threshold into home despite state statute authorizing warrantless entry to make felony arrests). More recently, the Supreme Court has explained that

we have treated reasonableness as a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of circumstances in a given case; it is too hard to invent categories without giving short shrift to details that turn out to be important in a given instance, and without inflating marginal ones.

*United States v. Banks,* 540 U.S. 31, 36, 124 S.Ct. 521, 157 L.Ed.2d 343 (2003) (discussing reasonableness in execution of search warrants).

¶ 43 Similarly, in *Comer,* the Utah Court of Appeals "decline[d] to adopt a rule whereby a reliable domestic disturbance report, by itself, would be viewed as supporting" a warrantless entry based on a presumed "serious physical injury." *Comer,* 2002 UT App 219 at ¶ 20, 51 P.3d 55. Although a serious crime, domestic violence reports "run the whole range from simply having a verbal argument to severe violence." *Id.* at ¶ 5. Furthermore, Utah law permits officers to "use all *reasonable* means" they may deem "*reasonably* necessary to provide for the safety of the victim and any family or household member" where domestic violence is apparent. Utah Code Ann. § 77–36–2.1(1)(a) (2003) (emphasis added). Thus, even in instances of domestic violence, police are required to assess the situation and conform their actions to a standard of reasonableness, entering only when an exigency is present. *See Comer,* 2002 UT App 219 at ¶ 27 n. 11, 51 P.3d 55 (the police "can effectively address the volatility of domestic disputes through the *existing* exigent circumstances exception to the warrant requirement" (emphasis added)); *see also United States v. Davis,* 290 F.3d 1239, 1244 (10th Cir.2002) ("[W]e hold an officer's warrantless entry of a residence during a domestic call is not exempt from the requirement of demonstrating exigent circumstances."); *State v. Frankel,* 179 N.J. 586, 847 A.2d 561 (2004) (rejecting *per se* rule permitting warrantless entry on basis of a 911 hang-up call); *Commonwealth v. Kiser,* 48 Mass.App.Ct. 647, 724 N.E.2d 348, 351 (2000) (loud party is "not the sort of riotous behavior that justified entry under the statute" which was intended to permit entry for breach of peace).

¶ 44 We are also unwilling to replace the reasonableness requirement with a per se rule concerning domestic violence that disregards other factors in the totality of the circumstances. Our rejection of a rule that would grant a suspicion of domestic violence the status of a per se exigent circumstance does not render considerations of domestic violence irrelevant. Just as it would be unwise to permit factors bearing on domestic violence to sweep aside other relevant considerations when applying a totality of the circumstances assessment, it would be likewise improper to dismiss the domestic violence as a factor which could contribute to a finding of exigent circumstances. There was no finding that any of the parties to the altercation in the Brigham City home were cohabitants, and therefore, domestic violence considerations have no place in the evaluation of whether exigent circumstances justified the intrusion.

¶ 45 The decision of the court of appeals is affirmed.

¶ 46 Chief Justice DURHAM and Justice PARRISH concur in Justice NEHRING's opinion.

DURRANT, Justice, concurring and dissenting:

¶ 47 Although I agree with much of the majority's opinion, I respectfully dissent from its application of the exigent circumstances doctrine to the facts of this case. In my view, the Fourth Amendment does not prescribe paralysis when law enforcement officials are eyewitnesses to an ongoing assault and immediate intervention is necessary to prevent physical harm.

¶ 48 The question posed by this appeal is whether police officers who personally witness an ongoing physical altercation in a residence may enter that residence in order to prevent bodily harm, or whether those officers must remain rooted onlookers, waiting passively for violence to escalate to a point at which severe harm is likely to occur. Unlike the majority, I conclude that the Fourth Amendment does not require police officers to be spectators in the face of ongoing violence and, in fact, allows officers to intervene in circumstances like those present in this case.

¶ 49 The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Although the amendment has been interpreted as drawing "a firm line at the entrance to the house," *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), that line can be crossed so long as the government entry is reasonable under the circumstances, *see Illinois v. McArthur*, 531 U.S. 326, 330, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) (observing that the Fourth Amendment's " 'central requirement' is one of reasonableness"); *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) ("The touchstone of our analysis under the Fourth Amendment is [and] always [has been] the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." (internal quotation omitted)).

¶ 50 It is well established that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton*, 445 U.S. at 586, 100 S.Ct. 1371. However, "[t]he ordinary requirement of a warrant is sometimes supplanted by other elements that render the unconsented search 'reasonable.' " *Illinois v. Rodriguez*, 497 U.S. 177, 185, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). As the majority correctly acknowledges, a warrantless entry into a home is reasonable if the entry can be justified under either the emergency aid or exigent circumstances doctrine. *See, e.g., Welsh v. Wisconsin*, 466 U.S. 740, 749–50, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984); *State v. Comer*, 2002 UT App 219, ¶¶ 17, 21, 51 P.3d 55; *State v. Beavers*, 859 P.2d 9, 18 (Utah Ct.App.1993). Both of these doctrines allow for warrantless entries to prevent physical harm. *See, e.g., Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (stating that the need to protect life or prevent injury in an emergency or exigent situation justifies otherwise unconstitutional behavior); *Comer*, 2002 UT App 219 at ¶ 5 n. 1, 51 P.3d 55 (noting that the emergency aid doctrine can be invoked

when officers "have an objectively reasonable basis to believe that an emergency exists and believe there is an immediate need [of] assistance for the protection of life"); *Beavers*, 859 P.2d at 18 (observing that exigent circumstances exist when officers reasonably believe immediate entry is required "to prevent physical harm to the officers or other persons" (internal quotation omitted)).

¶ 51 I agree with the majority that, in this case, the trial court's factual findings cannot be read to justify the officers' warrantless entry on the theory that the officers were supplying "emergency aid." I disagree, however, with the majority's conclusion that the situation encountered by the officers was insufficiently "exigent" to justify an immediate entry.

¶ 52 "There is ... no absolute test for determining whether exigent circumstances are present because such a determination ultimately depends on the unique facts of each case." *United States v. Gray*, 71 F.Supp.2d 1081, 1084 (D.Kan.1999) (citing *United States v. Anderson*, 154 F.3d 1225, 1233 (10th Cir.1998)). "Generally, exigency does not evolve from one individual fact. Instead, there is a mosaic of evidence, no single part of which is itself sufficient." *State v. Ashe*, 745 P.2d 1255, 1258 (Utah 1987). Consequently, a reviewing court must evaluate the totality of the facts and circumstances surrounding the warrantless entry, *see id.*, while considering how those facts and circumstances "would have appeared to prudent, cautious, trained officers," *Gray*, 71 F.Supp.2d at 1084.

¶ 53 The majority accurately acknowledges that the emergency aid and exigent circumstances doctrines impose different thresholds of harm that must be met before the doctrines can be properly invoked. *See supra* ¶ 29. As evidence of this distinction, the majority reasons that officers are more likely to encounter threats to their personal safety when pursuing a law enforcement objective than when serving in a caretaking capacity. *See supra* ¶¶ 29–30. That distinction does

partially explain why the exigent circumstances doctrine can be invoked in situations where the level of harm at issue is significantly lower than in an emergency aid situation.

¶ 54 However, in my view, the pivotal reason for requiring a lower quantum of harm in the exigent circumstances context is that officers invoking exigency must first show probable cause of criminal activity before making a warrantless entry, a requirement absent in the emergency aid context. Because invocation of the exigent circumstances doctrine demands the presence of probable cause, that doctrine is a significantly less dramatic departure from typical Fourth Amendment requirements than the emergency aid doctrine. This fact diminishes the necessity of demanding high level of physical harm before allowing a warrantless entry in exigent circumstances, as the high physical harm threshold of the emergency aid doctrine is set, at least partially, to ensure that the doctrine is not utilized as mere pretext.

¶ 55 Here, the officers were justified in entering the residence because, at the time of their entry, they possessed both probable cause that a continuing assault was being committed within the residence[1] and a reasonable belief that an immediate entry was necessary to prevent physical harm to others. *See Beavers*, 859 P.2d at 17–18.

¶ 56 According to the trial court, officers investigating a noise complaint observed underage drinking through a slat fence bordering the backyard of the residence that was the subject of the complaint. Upon entering the backyard, the officers were able to see into the residence through windows and a screen door. At that moment, the officers became eyewitnesses to a physical altercation involving five individuals, one of whom was a juvenile. The officers saw the four adults attempting to restrain the juvenile. It could not have been clear which of the parties to the melee were victims and which were instigators. Also, the officers could not have known whether they were witnessing domes-

---

1. The officers also had probable cause to believe that multiple other crimes were occurring. Before entering the residence, the officers had already directly observed underage drinking, intox-ication, and disorderly conduct. Arrests were ultimately made for contributing to the delinquency of a minor, furnishing alcohol to minors, disorderly conduct, and intoxication.

tic violence, as even trained police officers do not have the necessary clairvoyance to instantly determine if participants in a physical altercation are members of the same household. The officers, while observing the ongoing struggle, saw the juvenile wrest a hand free and "smack" one of the adults in the nose. Given that the officers had already observed underage drinking, they could have reasonably believed that alcohol was fueling the altercation, which had the potential to further escalate and cause additional harm to the participants in the fight. There will be uncertainties in any law enforcement situation. The officers in the present case were, no doubt, uncertain about many things. However, they were certain that a fight was in progress, that the participants had likely been consuming alcohol, and that at least one individual had already sustained an injury.

¶ 57 The Fourth Amendment does not demand certainty before action. It demands only reasonableness. Because there is always some level of uncertainty about the nature of events police officers encounter, "[o]n the spot reasonable judgments by officers about risks and dangers are protected." *Fletcher v. Town of Clinton*, 196 F.3d 41, 50 (1st Cir.1999). Already armed with probable cause, the officers on the scene reasoned that immediate entry was necessary to prevent harm. That judgment was not unreasonable under the circumstances and does not offend the Fourth Amendment. *See, e.g., id.* at 49 ("Evidence of extreme danger in the form of shots fired, screaming, or blood is not required for there to be some reason to believe that a safety risk exists."); *Tierney v. Davidson*, 133 F.3d 189, 198 (2d Cir.1998) ("The absence of blood, overturned furniture or other signs of tumult" does not require an officer "to withdraw and go about other business, or stand watch outside the premises listening for the sounds of splintering furniture."); *United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir.1995) ("We do not think

the police must stand outside an apartment despite legitimate concerns about the welfare of an occupant, unless they can hear screams. Doubtless outcries would justify entry, but they are not essential.").

¶ 58 The majority would have the officers in this case stand outside, powerless and removed from the location of the brawl. The majority would conclude otherwise, apparently, if a knife had been pulled from a nearby kitchen drawer, elevating the potential severity of physical harm that a participant in the fight—or an innocent bystander—could suffer. The majority's rule consigns law enforcement to the porch steps until it is too late to prevent the very injury the majority concedes officers are entitled to prevent.[2]

¶ 59 The majority contends that the officers were not completely foreclosed from taking action: they could have knocked. The trial court's findings of fact illustrate, however, that the majority puts undue emphasis on the officers' decision to forego knocking before intervening in the fight. While it is true that "the method of an officer's entry into a dwelling [is] among the factors to be considered in assessing the reasonableness of a search and seizure," *Wilson v. Arkansas*, 514 U.S. 927, 934, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995), it is not unreasonable for officers to bypass knocking or announcing their presence if such an action would be futile, dangerous, or inhibit an effective investigation of the suspected crime, *see Richards v. Wisconsin*, 520 U.S. 385, 394, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997); *see also Ingram v. City of Columbus*, 185 F.3d 579, 588 (6th Cir.1999) (stating that just as certain exigencies excuse the warrant requirement, certain circumstances excuse officers from announcing their presence before entering a dwelling). The trial court's unchallenged findings note that the officers encountered a "loud, tumultuous" situation and that a knock on the door would have almost certainly gone unnoticed. In

---

2. Of course, the circumstances in which a warrantless entry into a home can be justified, even if the officers possess probable cause, are rare. In fact, there will be many situations where officers who have probable cause to believe that a technical assault is occurring within a home will nevertheless be unjustified in entering that home without a warrant, e.g., if an officer witnesses one individual slap another and there was no prospect of continuing violence. After all, the Fourth Amendment demands that any entry be reasonable under the circumstances. However, in this case we are dealing with the rare situation in which ongoing violence, actually witnessed by police officers, was of a sufficient degree to justify an immediate entry.

fact, evidence adduced below showed that, even after entering the residence, the officers had to shout above the din multiple times before the occupants became aware of their presence.

¶ 60 When it is apparent that an immediate physical entry into a dwelling is necessary in order to quell ongoing violence, it is ill-advised to require officers to waste precious time on the doorstep engaged in a futile attempt to announce their presence. The Fourth Amendment does not require such empty gestures.

¶ 61 Although the officers in this case were faced with uncertainties, the critical aspects of the situation were clear. The officers were eyewitnesses to a "loud, tumultuous," and ongoing brawl. Alcohol was obviously being consumed, one blow had been struck, and the officers could have reasonably believed that their intervention was necessary to prevent further injuries. In such a potentially volatile situation, neither the Fourth Amendment nor sound public policy prevents police intervention to secure the peace and protect the public. Accordingly, I would conclude that the officers did not offend the Fourth Amendment's reasonableness requirement in the present case and would therefore reverse the court of appeals.

¶ 62 Associate Chief Justice WILKINS concurs in Justice DURRANT's opinion.