**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 9, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

       Plaintiff - Appellee,

v.

JOSEPH FLEMING PORTER,

       Defendant - Appellant.

No. 07-4158

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:06-CR-119-TS)**

---

Diana Hagen, Assistant United States Attorney (Brett L. Toman, United States Attorney, on the briefs), Salt Lake City, Utah, for Plaintiff - Appellant.

Bretta Pirie, Assistant Federal Public Defender (Steven B. Killpack, Federal Public Defender and Scott Keith Wilson, Assistant Federal Public Defender, on the briefs), Salt Lake City, Utah, for Defendant – Appellant.

---

Before **O'BRIEN**, **TYMKOVICH**, and **HOLMES**, Circuit Judges.

---

**O'BRIEN**, Circuit Judge.

---

Police officers searched Joseph Porter's home without a warrant while responding to a 911 call stating he had pointed a gun at the female caller while she was visiting his

home. We must determine whether, under *Michigan v. Fisher*, --- S. Ct.---, No. 09-91, 2009 WL 4544992 (December 7, 2009) (per curium),[1] the police officers' entry was justified by a reasonable belief that an occupant of the home was in danger. *Id.* at *3. We AFFIRM the denial of Porter's motion to suppress.

## I. BACKGROUND

At approximately 1:30 p.m. on February 15, 2006, the Salt Lake City, Utah, Police Department received a 911 call from Kenya Fox. The dispatch report indicates Fox stated:

- A man named Porter had threatened her with a .38 caliber firearm;

- The man had been drinking;

- Another woman named Teresa had taken the weapon from Porter and placed it in a front bedroom of the home;

- Porter and Teresa had recently been released from prison;

- Porter had been imprisoned for murder;

- Fox had left the house to pick up her son but would return in a silver van to meet police officers.

Dispatch relayed this information to police officers in the area, using both radio and a mobile data terminal. Dispatch also reported Fox had called back but her cell phone died and there were no further details. The next report revealed no outstanding warrants were found on the suspect. According to Officer Irvine, one of two officers

---

[1] *See Brigham City, Utah v. Stuart*, 547 U.S. 398 (2006), and *United States v. Najar*, 451 F.3d 710 (10th Cir. 2007).

testifying at the evidentiary hearing, he arrived at the residence approximately six minutes after the first dispatch call. As a sixteen-year veteran of the Salt Lake City Police Department, Irvine knew of Fox and Porter from earlier encounters. Irvine had responded to Porter's address "two or three times" before this call.[2] (R. Vol. II at 13.) One contact with Porter occurred approximately six months earlier during Irvine's investigation of a complaint that Porter had used a baseball bat to break a window. Irvine remembered that contact because Porter was particularly belligerent. Irvine also knew Porter "had been in prison at some time for something." (*Id*. at 14.) Irvine testified Fox had a reputation as someone who "runs in some rough circles" and "gets into trouble a lot." (*Id*. at 33.) The neighborhood itself was "notorious" for its high drug traffic and other criminal activity, such as assaults. (*Id*. at 15.)

Officer Zubal, the second testifying officer, arrived approximately thirty seconds after Irvine, immediately followed by Officers Sipes and Hendricks.[3] Hendricks

---

[2] Originally the suspect's name was reported as Johnson Smith Porter but dispatch corrected the name prior to the officers' arrival on the scene.

[3] Following her initial report, Fox called again requesting an officer call her and stating she would be waiting in a tan vehicle in Porter's driveway. This entry is not time-stamped and there was some confusion whether this information was available before the officers went to Porter's door. Irvine testified this information was included in the dispatch report in "additional notes added to the log after [he] had been there." (R. Vol. II at 13.) Later, however, he testified "The problem is I remember being given [the] impression that she was in the area before I arrived, but it is in the log lower than it should be, given what I recall." (*Id*. at 32.) On redirect, Irvine was asked, "But [this information] does show on the dispatch log, doesn't it, on this line . . . . Could it be that it came in before you arrived on the scene?" (*Id*. at 36) Irvine replied, "It's possible." (*Id*.) Zubal testified he saw the information before he arrived on the scene. (*Id*. at 40.) It is uncontested that there was no tan vehicle in the driveway when the officers arrived. In its ruling, the court determined the officers received information that Fox would be in

positioned himself behind the house while Irvine, Zubal and Sipes approached the front door. Irvine knocked on the door. According to the officers, Porter answered but only partially opened the door and stood with his left hand hidden. Irvine told Porter the officers were checking a report of a fight and twice asked Porter to show his left hand. Porter refused and glanced to his left. Through the crack in the door, Irvine stated he could see a baseball bat to Porter's left. Irvine could also hear voices behind Porter. Irvine, worried about the bat and possibly a gun, grabbed Porter by his right arm, pulled him onto the porch, and handcuffed him. As he did so, the door swung open revealing two females in the front room. This confrontation lasted ten to thirty seconds.

As Irvine secured Porter, Zubal and Sipes entered the front room "to do a security check for other persons." (*Id.* at 19.) Upon entry, Zubal went through a hallway into the front bedroom.[4] (*Id.* at 52.) There he saw the butt of a revolver "partially poking out of a black bag" on the right side of the bed. (*Id.* at 46.) He did not immediately seize the gun but went back to the front room to report its presence. Irvine completed a pat-down search of Porter and took Porter into the living room so Irvine could watch him and the two women while the other officers finished "clearing the house." (*Id.* at 33.) A quick scan of the house revealed no other people or weapons. Fox returned to the scene approximately fifteen to thirty minutes after the officers had secured the home. Officer Stephan Bennett, a Salt Lake City police officer assigned to the Bureau of Alcohol,

---

the area before they went to Porter's door. Because the record supports the district court's finding, it is not clearly erroneous. *See Najar*, 451 F.3d at 717.

[4] Zubal could not remember with certainty whether he asked the two women if they were hurt.

- 4 -

Tobacco and Firearms joint task force, was called to the scene. He confirmed Porter was a convicted felon, interviewed witnesses, and arranged for crime lab personnel to photograph the gun.

Porter was indicted for being a felon in possession of a .38 caliber revolver in violation of 18 U.S.C. § 922(g)(1) (Count I), and assault on a law enforcement officer, in violation of 18 U.S.C. § 111(a) (Count II).[5] Prior to trial, Porter moved to suppress the gun, claiming the search of his home violated his Fourth Amendment rights. The district court denied the motion, finding the existence of an objectively reasonable belief that an occupant on the premises was in immediate danger. The jury found Porter guilty of being a felon in possession of a firearm; he was later sentenced to seventy months imprisonment.

## II. DISCUSSION

The right of people to be secure in their persons and homes against unreasonable searches and seizures is guaranteed by the Fourth Amendment. Thus, "warrants are generally required to search a person's home or his person." *Brigham City,* 547 U.S. at 403 (quotations omitted). "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* (quotations omitted). An exception to the warrant requirement exists, however, "when the exigencies [in a situation] . . . make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Id.* This

---

[5] While being escorted out of the house to be taken to jail, Porter attempted to kick Bennett.

exception "must be strictly circumscribed by the exigencies." *Mincey v. Arizona,* 437

U.S. 385, 393 (1978) (quotations omitted).  It cannot be used merely to make law

enforcement more efficient, to safeguard evidence that could be protected in another

manner, or simply because a serious crime has been committed.  *Id.* at 393-94.  That said,

"the Fourth Amendment does not bar police officers from making warrantless entries and

searches when they reasonably believe that a person is in need of immediate aid."  *Id.* at

392.  The emergency aid exigency which emerged from *Mincey* is informed by the

practical recognition of critical police functions quite apart from or only tangential to a

criminal investigation.[6]  The police need not stand by when violence erupts and wait for a

blow to render a victim unconscious.  "The role of a peace officer includes preventing

violence and restoring order, not simply rendering first aid to casualties; . . ."  *Brigham*

*City,* 547 U.S. at 406.

The government does not claim the officers had probable cause to arrest Porter at

the time Zubal and Sipes entered his house to do the security check.[7]  And it does not

---

[6] "[B]y design or default, the police are also expected to reduce the opportunities for the commission of some crimes through preventative patrol and other measures, aid individuals who are in danger of physical harm, assist those who cannot care for themselves, resolve conflict, create and maintain a feeling of security in the community and provide other services on an emergency basis."  3 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 6.6 (4th ed.) (quotations omitted).

[7] Because the "security check" here was based on concern for civilians who may be within the home, it may be distinguished from what is commonly called a "protective sweep" under *Maryland v. Buie*, 494 U.S. 325, 327 (1990).  A protective sweep based solely on the safety of law enforcement officers may be conducted "only incident to an arrest."  *See United States v. Walker,* 474 F.3d 1249, 1254 (10th Cir. 2007); *see also United States v. Davis*, 290 F.3d 1239, 1242 n. 4 (10th Cir. 2002) (rejecting an argument that protective sweeps should sometimes be permitted absent an arrest); *United States v.*

justify the sweep based on officer safety. As presented in this appeal, the search was within Fourth Amendment parameters only if the officers could reasonably believe a civilian needed immediate aid.

"The existence of exigent circumstances is a mixed question of law and fact." *Najar*, 451 F.3d at 717 (quotations omitted). We determine "whether the district court's factual findings are clearly erroneous, viewing the evidence in the light most favorable to the district court's findings." *Id.* But "[t]he ultimate question regarding the reasonableness of the search is a question of law which we review *de novo." Id.* (quotations omitted). The government bears the burden of proof and "[t]hat burden is especially heavy when the exception must justify the warrantless entry of a home." *Id.* (citation omitted). Because our determination is a fact specific inquiry we recount, in some detail, not only the facts of this case but those underlying the relevant precedent. *See id.* at 715.

In *Brigham City*, police officers responded to a call at 3:00 a.m. reporting a loud party. 547 U.S. at 400-01. Upon arrival, the officers heard shouting inside the residence. Through the screen door and windows, they observed four adults attempting to restrain a juvenile. When the juvenile broke away, he struck one of the adults, causing the adult to spit blood into a nearby sink. An officer opened the screen door and announced the police officers' presence. Unheard over the tumult, the officer entered the kitchen and shouted to get the combatants' attention. As his presence was noted, the altercation

---

*Smith*, 131 F.3d 1392, 1396 (10th Cir. 1997) ("protective sweep is a brief search of premises during an arrest to ensure the safety of those on the scene").

gradually ceased. *Id.* at 401.

The adults were arrested and charged with contributing to the delinquency of a minor, disorderly conduct and intoxication. They moved to suppress all evidence obtained after the officers entered the home, claiming the warrantless entry violated the Fourth Amendment. The trial court granted the motion and the Utah Court of Appeals agreed. *Id.* The Utah Supreme Court affirmed holding the injury caused by the juvenile's punch was insufficient to trigger the emergency aid or exigent circumstances doctrine. *Id.* at 402-03.

The United States Supreme Court reversed, noting "[o]ne exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Id.* at 403. The test is whether the circumstances, viewed objectively, justify the action; "[t]he officer's subjective motivation is irrelevant." *Id.* at 404. Under this test, the Court determined the circumstances provided the officer an objectively reasonable belief "the injured adult might need help and that the violence in the kitchen was just beginning." *Id.* at 406.

In *Najar*, at approximately 2:00 a.m., a New Mexico police officer received a call from police dispatch involving a "911 disconnect." 451 F.3d at 715. The dispatcher told the officer en route to the home that four attempts to call the residence resulted in the phone being answered and immediately hung up. *Id.* at 716. When the officer arrived and knocked on the door, he received no answer, even though the lights were on. *Id.* Upon the arrival of several more officers, they walked around the trailer hearing noise and seeing movement inside. Repeated and increasingly rigorous efforts by the officers

to contact the occupant were unsuccessful.  The officers asked dispatch to call the number again and "stood close enough to the house to hear the phone ringing continuously."  *Id.* at 716.  After one of the officers pointed his flashlight on the resident and knocked on the window, Najar opened the front door.  Najar said everything was okay, no one else was in the home and he had not made a 911 call.  The officers entered the home even though Najar refused his permission.  *Id.* at 716-17.

To determine whether the officers' warrantless entry into Najar's home was justified by exigent circumstances, we considered: "whether (1) the officers [had] an objectively reasonable basis to believe there [was] an immediate need to protect the lives or safety of others, and (2) the manner and scope of the search [was] reasonable."[8]  *Id.* at 718.  Given the nature of the 911 call, the officers' reasonable belief someone might be preventing communication with safety officials, Najar's reluctance to answer the door and his obfuscation regarding the existence of the 911 call, we concluded "the totality of the circumstances" demonstrated "reasonable grounds to believe someone in the trailer may have been in need of emergency aid "and immediate action was required."  *Id.* at 720.

Most recently, in *Fisher*, police officers responded to a complaint and were directed "to a residence where a man was 'going crazy'."  2009 WL 4544922 at *1.  The

---

[8] Porter wisely declines to argue the scope or manner of the search was unreasonable.  It is uncontested the officers took only a visual scan of the rooms in Porter's home.  The security check was limited to areas where people may be present and no drawers were opened.  Thus, we need only consider whether the officers had an objective, reasonable basis to believe their entry was necessary to protect the lives and safety of others.

officers encountered:

> a pickup truck in the driveway with its front smashed, damaged fenceposts along the side of the property, and three broken house windows, the glass still on the ground outside. The officers also noticed blood on the hood of the pickup and on clothes inside of it, as well as on one of the doors to the house . . . . Through a window, the officers could see . . . Fisher inside the house, screaming and throwing things.

*Id.* Fisher refused to answer the door. The officers saw a cut on his hand and "asked him whether he needed medical attention. Fisher ignored these questions and demanded, with accompanying profanity, that the officers go to get a search warrant." *Id.* One officer then "ventured into the house . . . . and saw Fisher pointing a long gun at him." *Id.* The officer withdrew.

The Michigan courts concluded the officer violated the Fourth Amendment when he entered Fisher's house. The Supreme Court granted the State's petition for certiorari and reversed. Applying the principles set forth in *Brigham City* to the situation faced by the responding officers, the Court determined "it was reasonable to believe that Fisher had hurt himself (albeit nonfatally) and needed treatment that in his rage he was unable to provide, or that Fisher was about to hurt, or had already hurt, someone else." *Id.* at *3. The test "is not what [the officer] believed, but whether there was an objectively reasonable basis for believing that medical assistance was needed, or persons were in danger." *Id.* (quotations omitted). Thus, the Michigan Court of Appeals erred when it "replace[d] that objective inquiry into appearances with its hindsight determination that there was in fact no emergency."[9] *Id.*

---

[9] Subsequent investigation revealed Fox and Porter were in a heated argument and

- 10 -

Mindful of the legal landscape, we turn to this case. Our test is two-fold, whether (1) the officers have an objectively reasonable basis to believe there is "medical assistance . . . needed, or persons [are] in danger," *id.*, and (2) the manner and scope of the search is reasonable . . . ." *Najar,* 451 F.3d at 718. We are "guided by the realities of the situation presented by the record" and consider the facts from the viewpoint of "prudent, cautious, and trained officers." *Id.* at 718-19. Reasonable belief does not require absolute certainty; the standard is more lenient than the probable cause standard. *Id.* at 718. "Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception."[10] *Fisher*, 2009 WL 4544992 at *3.

In this case, the district court reasoned:

> [The] officers were responding to a 911 call which indicated an immediate need to protect lives because it purported to relate to an assault by a man with a gun . . . . Furthermore, officers knew that they were responding to a call: by a caller who was known by them as [a] person who frequently got into trouble; at the residence of a known and potentially violent convicted felon; in an area with a reputation for drug traffic and crime. Moreover, . . . Defendant here was uncooperative once officers arrived, refusing to show them his left hand, despite repeated requests, and otherwise acting in a belligerent manner . . . .
>
> Given that the officers were unable to locate the caller, who was expected

---

"fighting words" were exchanged before Porter went to the bedroom to retrieve the gun. (Vol. III at 5-6.) There was some testimony Fox went into the kitchen to arm herself before Porter got the gun. It is undisputed Fox continued to argue with Porter even while the gun was pointed at her. However, these facts were not known to the police officers.

[10] In *Fisher*, the Court noted: "The only injury police could confirm in *Brigham City* was the bloody lip they saw the juvenile inflict upon the adult. Fisher argues that the officers here could not have been motivated by a perceived need to provide medical assistance, since they never summoned emergency medical personnel. This would have no bearing, of course, upon their need to assure that Fisher was not endangering someone else in the house." 2009 WL 454492 at *3.

> to be at the residence at the time of their arrival, and that they could hear and see individuals in the residence where a firearm was allegedly located, the officers had reasonable grounds to believe that someone inside the residence may have been in need of emergency aid and that immediate action was required.

(R. Vol. I, Doc. 33 at 6.)

Porter does not challenge the officers' seizure of his person when he refused to show his left hand. Rather, he argues (1) once he was handcuffed and the two women were in plain sight of the officers there was no immediate need for the police to enter and search his home, (2) unlike *Najar*, there was no 911 hang up and Fox reported she had left the premises and was in no immediate danger, and (3) unlike *Brigham City*, the officers heard no shouting or sounds of a scuffle; there was merely conversation. Porter emphasizes the following facts: (1) Fox did not say Porter pointed the gun at anyone else; (2) she did not report an ongoing situation but had left and made no mention of any difficulty in leaving, and (3) Porter was disarmed by another woman who placed the gun in a bedroom. Thus, he contends "the police had no information suggesting that anyone within the house was injured or that anyone was in danger from Mr. Porter." (Appellant's Br. at 10.) We disagree.

While "one *might* call 911 to provide a narrative report of a crime absent any imminent danger," *Davis v. Washington*, 547 U.S. 813, 827 (2006), this 911 call contains specific information about a very recent and dangerous situation. When the officers arrived, they expected Fox to be in the area but did not see her. The government contends the officers "had reasonable grounds to believe that someone inside the house still had access to the firearm and could pose a threat to others present." (Appellee's Br.

- 12 -

at 14.)

The realities of the situation presented by the record reveal the officers were faced with a report from Fox who, only minutes earlier, was threatened with a gun by a man who had been drinking. The officers expected Fox to be in the area but she was not seen. The gun was unaccounted for even though Porter was handcuffed. The number of people in the home and their identities were unknown. At the time of their arrival, the officers knew Fox "ran around in rough circles," Porter had "served time for something," and had violent tendencies which previously resulted in property damage. Irvine had been to this address at least twice before and had first-hand experience with Porter's attitude. When Porter opened the door, he refused to show his left hand and had a weapon (the bat) within reach. Voices could be heard but not identified. Two women could be seen inside when the door was fully opened. Officer Zubal testified he entered the home because the officers "were concerned about who may be in the house and concerned about the firearm due to the information . . . we had prior to arriving on the call." (R. Vol. II at 44.) Once the police entered, the search was limited to checking the home for occupants.

These events moved very quickly. Porter argues the officers should have taken into account Fox's credibility but "the business of policemen and firemen is to act, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process." *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963). "The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties; . . ." *Brigham City*, 547 U.S. at 406. The totality of the circumstances

- 13 -

created a reasonable belief that someone within the premises may be in immediate danger, justifying the police entry.

The security check occurred immediately after Porter was handcuffed. The gun was in plain view; it was not the product of a search for evidence and was not seized until further investigation supplied probable cause to do so. The scope and manner of the search was objectively reasonable. *Najar*, 451 F.3d at 718.

**AFFIRMED**.[11]

---

[11] Although Porter is represented by counsel on appeal, he filed a pro se motion to file a supplemental brief. We deny his motion. The issues he wishes to raise involve ineffective assistance of trial and appellate counsel which are not appropriate in this direct appeal. *See United States v. Turner*, 553 F.3d 1337, 1349 n.8 (10th Cir.), *cert. denied*, 129 S. Ct. 2446 (2009).