*This opinion is subject to revision before final publication in the Pacific Reporter*

**2024 UT 7**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Respondent*,

*v.*

ALEXANDER HUNG TRAN,
*Petitioner*.

No. 20220560
Heard September 8, 2023
Filed February 29, 2024

On Appeal of Interlocutory Order

Third District, Salt Lake
The Honorable Elizabeth A. Hruby-Mills
No. 151910799

Attorneys:

Sean D. Reyes, Att'y Gen., Jonathan S. Bauer, Asst. Solic. Gen.,
Salt Lake City, for respondent

Sarah J. Carlquist, Salt Lake City, for petitioner

JUSTICE POHLMAN authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE PEARCE,
JUSTICE PETERSEN, and JUSTICE HAGEN joined.

JUSTICE POHLMAN, opinion of the Court:

### INTRODUCTION

¶1 Alexander Hung Tran appeals the district court's denial of his motion to suppress evidence that police officers obtained during a warrantless entry and search of his home. The court concluded that suppression was unwarranted because an objectively reasonable basis existed for the officers to believe that they needed to enter the home to render emergency aid.

¶2 Tran raises two arguments on appeal. First, he contends that the entry and search of his home do not fall within the emergency aid exception to the warrant requirement of the Fourth Amendment to the United States Constitution. And second, Tran asks us to interpret article I, section 14 of the Utah Constitution to provide greater protection to Utah residents than that provided by the Fourth Amendment. Specifically, Tran asserts that section 14 does not allow for exceptions to the warrant requirement and that, even if it does, we should adopt a more protective standard than that applied under the Fourth Amendment. In line with this heightened protection, Tran argues that the police officers violated his section 14 rights in entering and searching his home without a warrant.

¶3 We conclude that the entry and search of Tran's home were reasonable and justified under the emergency aid exception to the Fourth Amendment's warrant requirement. And we decline at this time to recognize broader protection under the Utah Constitution in the emergency aid context. Accordingly, we affirm.

**BACKGROUND**

¶4 One September afternoon, a grandmother (Grandmother) was supposed to pick up her eight-year-old grandson (Child) from elementary school. Grandmother was Child's caretaker and was always punctual in picking him up from school. But this day, she did not arrive as usual. Several hours after the normal pick-up time had passed, the school principal contacted the police. Officer Peck responded to the call and met the principal at the school. The principal told Officer Peck that Grandmother's tardiness was "unlike her" as "she was always on time." Officer Peck then tried several times to reach Grandmother on her phone, but she did not answer.

¶5 While Officer Peck met with the school principal, a second officer, Officer Crockett, made her way to Grandmother's last known address. When Officer Crockett arrived, she noticed "a vehicle in the driveway parked at an odd angle with extensive front-end damage and an open trunk."

¶6 This was not the first time the police had responded to a call at this home. Of note, Officer Crockett had, about three months earlier, responded to a call about "a male who seemed to be having psychiatric issues" and "was waving some knives around." Officer Crockett had that individual, who turned out to be Tran, admitted for a psychiatric evaluation. Officer Crockett was also aware that

the police had been called to the home "numerous" times and had responded to an occupancy dispute just a few days prior.

¶7 Officer Crockett knocked on the front door and rang the doorbell. After receiving no response, she joined Officer Peck at the school. While there, Child's other grandmother (Relative) arrived. Relative expressed concern over Grandmother's whereabouts because it was unlike Grandmother to be late and because she was also caring for a two-month-old infant (Infant). Like the officers, Relative had called Grandmother's phone but had been unable to reach her.

¶8 Relative then told the officers that she had a key to Grandmother's residence and "permission to enter." The three left the school and traveled to the home. Upon arriving there, Relative informed the officers that the damaged vehicle in the driveway did not belong to Grandmother. The officers also learned that the damage was from a prior incident.

¶9 Once at the front door, the officers knocked but received no response. They could hear a television inside but otherwise did not notice signs of anyone being present. Relative then looked through the beveled window of the front door and was alarmed to see a "tarp on the floor with a large object underneath it," which "wasn't typical." The officers looked through the window and saw the same scene, believing that the tarp may have been covering a body.

¶10 Relative explained to the officers that the reason Grandmother was caring for Infant and Child was that their mother (Grandmother's daughter) was in jail on human trafficking charges. Relative alluded to "possible retaliation for the daughter testifying against other players" in the human trafficking case. The officers ultimately told Relative to leave the scene given the potential danger.

¶11 At this point, the officers debated what to do next. Officer Peck told Officer Crockett, "My only thing is . . . we go in and that is a murder, and we didn't have permission to go in and we just screw everything up." Officer Crockett responded, discussing the potential for the tarp to be covering a body, "Right. And, no, I'm not going to go in there because it's obvious that it's not—but that's what it looks like to me. Doesn't it look like [a covered body] to you?" Officer Peck agreed, saying, "That is odd. It looks—that could be a body in there."

¶12 Officer Crockett called her supervisor, Sergeant Manzanares, for backup while Officer Peck walked across the ungated backyard and found the back door to the home "wide open." Officer Peck decided to monitor the back door "until [they could] get another officer" at the scene. In all, Officers Peck and Crockett waited outside the home for about twenty minutes before Sergeant Manzanares arrived. During this time, they contemplated entering the home. Officer Peck reminded Officer Crockett that Relative had a key, and "she's giving us permission . . . that's enough for us" to enter. Officer Crockett responded, "Well, we don't even need it . . . [b]ecause of the two-month-old."

¶13 Once Sergeant Manzanares arrived, the officers made the decision to enter the home to check on the wellbeing of Grandmother and Infant. After entering through the back door, the officers found a dead male lying on the couch in the living room, as well as Grandmother, deceased, under the tarp. Officer Crockett then saw Tran holding a gun at the bottom of the stairs leading to the basement. Tran set the gun down and the officers took him into custody. As the officers continued their search for Infant, they observed spent shell casings at the bottom of the stairs and eventually discovered Infant, deceased, next to Grandmother under the tarp. After securing the house, the officers exited and contacted the homicide division, which obtained a search warrant to investigate the apparent crimes.

¶14 The State charged Tran with three counts of aggravated murder. But when the district court determined that Tran was not competent to stand trial, he was committed to the Utah State Hospital where he received treatment for several years. Later, after the court found Tran competent to stand trial, Tran moved to suppress the evidence obtained in the warrantless entry and search of his home. He argued that both the Fourth Amendment to the United States Constitution and article I, section 14 of the Utah Constitution prohibited the entry and search.

¶15 The district court held an evidentiary hearing where Officer Peck, Officer Crockett, and Sergeant Manzanares testified and where the court viewed the officers' body camera footage. After considering the evidence, the court denied Tran's motion to suppress. The court ruled that under the emergency aid exception to the Fourth Amendment's warrant requirement, the officers had "an objectively reasonable basis for believing that both [Grandmother] and [Infant] were in danger," justifying the entry and search. The court also addressed Tran's argument under

article I, section 14 of the Utah Constitution. While the court noted that the Utah Constitution may require some "heightened threshold" of exigency to permit the warrantless entry and search of a home, it ruled that such a heightened threshold was met in this case.

¶16 Tran petitioned for interlocutory appeal of the district court's denial of his motion to suppress, and we granted his petition.

## ISSUE AND STANDARD OF REVIEW

¶17 Tran asserts that the district court erred in denying his motion to suppress the evidence obtained during the search of his home. We review a "district court's ruling on a motion to suppress . . . for correctness, including its application of the law to the facts." *State v. Price*, 2012 UT 7, ¶ 5, 270 P.3d 527 (cleaned up). In making this assertion, Tran argues that we should interpret article I, section 14 of the Utah Constitution to provide greater protection for Utah residents than that provided by the Fourth Amendment to the United States Constitution. "Matters of constitutional interpretation are questions of law that we review for correctness, . . . provid[ing] no deference to the district court's legal conclusions." *State v. Poole*, 2010 UT 25, ¶ 8, 232 P.3d 519.

## ANALYSIS

¶18 In asking us to reverse the district court's denial of his motion to suppress, Tran argues that the warrantless entry and search of his home violated both the Fourth Amendment to the United States Constitution and article I, section 14 of the Utah Constitution. As for his state constitutional claim, Tran urges us to interpret section 14 either as not providing an emergency aid exception to the warrant requirement or, in the alternative, as providing an emergency aid exception that includes broader privacy protection than its federal counterpart.

¶19 Before addressing these arguments, we first respond to the State's suggestion that, in analyzing search and seizure claims brought under both the federal and state constitutions, we should adopt an "interstitial" model. Under that model, courts presume "that federal law is controlling and reach[] state constitutional issues only when the case cannot be resolved by reference to federal law." *West v. Thomson Newspapers*, 872 P.2d 999, 1006 (Utah 1994). Tran counters that we should adopt a "primacy" model under which courts look "first to state constitutional law, develop[]

independent doctrine and precedent, and decide[] federal questions only when state law is not dispositive." (Quoting *id.*)

¶20 We find it unnecessary to take a fixed position on which constitutional claim we should address first in the search and seizure context. Rather, we find it useful to take a case-by-case approach to determine whether there are any advantages or disadvantages in addressing one constitutional claim before the other. *See, e.g., State v. Tiedemann*, 2007 UT 49, ¶ 33, 162 P.3d 1106 (noting that while "we have endorsed" the primacy approach "in a number of cases," we have also "historically relied on other approaches" depending on the nature of the case). Here, because there is significant overlap between the two claims, the Fourth Amendment provides substantial foundation for Tran's state law claim. And because we ultimately determine that Tran's article I, section 14 claim fails for the same reason his Fourth Amendment claim fails, we find it most useful to address the Fourth Amendment before turning our sights to section 14.

### I. TRAN'S FOURTH AMENDMENT CLAIM FAILS BECAUSE IT WAS OBJECTIVELY REASONABLE FOR THE OFFICERS TO BELIEVE THAT GRANDMOTHER AND INFANT WERE IN NEED OF EMERGENCY AID

¶21 We begin with the text of the Fourth Amendment to the United States Constitution. It provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. Long ago, the United States Supreme Court recognized that this provision applies "to all invasions on the part of the government and its employes of the sanctity of a man's home and the privacies of life." *Boyd v. United States*, 116 U.S. 616, 630 (1886), *abrogated on other grounds by Warden v. Hayden*, 387 U.S. 294, 302 (1967). Indeed, as the Court has recognized, "when it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). "At the Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Id.* (cleaned up).

¶22 With this recognition, it has become "a basic principle of Fourth Amendment law that searches and seizures inside a home

without a warrant are presumptively unreasonable," *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (cleaned up), and thus violate the Fourth Amendment. But even so, "because the ultimate touchstone of the Fourth Amendment is reasonableness," the Court has adopted several exceptions to the warrant requirement. *Id.* (cleaned up).

¶23 One such exception is for "exigent circumstances," where "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable." *Lange v. California*, 141 S. Ct. 2011, 2017 (2021) (cleaned up). For example, the Court has held that police may conduct a warrantless search of a home into which a potentially armed criminal suspect has fled, as "[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 298–99 (1967).

¶24 Exigent circumstances excusing the warrant requirement also include the need to prevent the "imminent destruction of evidence, . . . the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling." *Minnesota v. Olson*, 495 U.S. 91, 100 (1990) (cleaned up). In these instances, a warrantless search is reasonable, and thus does not run afoul of the Fourth Amendment, because "the legitimate state interest served by the intrusion outweighs individual interests shielded by the Fourth Amendment." *State v. Rodriguez*, 2007 UT 15, ¶ 16, 156 P.3d 771 (citing *Delaware v. Prouse*, 440 U.S. 648, 654 (1979)).

¶25 Most relevant for our purposes is the emergency aid variant of the exigent circumstances exception to the warrant requirement. The emergency aid exception was first recognized by the Supreme Court in *Mincey v. Arizona*, where the Court observed "that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." 437 U.S. 385, 392 (1978). In recognizing this exception, the Court noted that "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Id.* (cleaned up). And as we've stated, the exception "strikes a balance between the rights protected by the Fourth Amendment and the interests of government to access a dwelling to safeguard the well-being of citizens." *Brigham City v. Stuart*, 2005 UT 13, ¶ 22, 122 P.3d 506, *rev'd on other grounds*, 547 U.S. 398 (2006).

¶26 The Supreme Court has refined the emergency aid exception since its adoption in *Mincey*. In *Brigham City*, the Court rejected this court's use of a subjective intent element to determine whether a warrantless entry and search incident to rendering emergency aid was reasonable. *See* 547 U.S. at 404–05. As we discuss below, *see infra* Part II.B, we had adopted a three-prong test to determine the reasonableness of a warrantless search under the emergency aid exception to the Fourth Amendment warrant requirement. *See Brigham City*, 2005 UT 13, ¶ 23. While two of those prongs required objective inquiries, one looked at the police officer's subjective intent in entering the home. *See id.* This element required that the entry and attendant search not be "primarily motivated by intent to arrest and seize evidence." *Id.*

¶27 But the Supreme Court rejected this formulation of the emergency aid exception. *Brigham City*, 547 U.S. at 404–05. It held that whether the search was "primarily motivated by intent to arrest and seize evidence" was "irrelevant" to the Fourth Amendment analysis. *Id.* at 404 (cleaned up). The Court emphasized that "[a]n action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed *objectively*, justify the action." *Id.* (cleaned up).

¶28 Accordingly, as it stands today, the emergency aid exception to the Fourth Amendment warrant requirement asks whether the police conducting the search had "an objectively reasonable basis for believing that a person within the house [was] in need of immediate aid." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (per curiam) (cleaned up). And as with other Fourth Amendment tests, we measure reasonableness "in objective terms by examining the totality of the circumstances." *State v. Baker*, 2010 UT 18, ¶ 10, 229 P.3d 650 (cleaned up); *see also Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (stating that the Supreme Court has "consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry," which requires reviewing courts to view all the circumstances facing officers in context).[1]

---

[1] In addition, courts also must ask under the Fourth Amendment whether the manner and scope of the search were reasonable. *See State v. Evans*, 2021 UT 63, ¶ 26, 500 P.3d 811 ("To be reasonable, a search must be (1) 'lawful at its inception,' and (2) 'executed in a reasonable manner.'" (quoting *Illinois v. Caballes*,

(continued . . .)

¶29   With this governing standard in mind, we turn to the case before us. For the reasons discussed below, we agree with the district court that, based on the totality of the circumstances, the police officers had an objectively reasonable basis to believe that Grandmother and Infant were in need of immediate aid.

¶30   In assessing the totality of the circumstances, we focus on the circumstances known to the officers the moment they decided to enter the home to render aid. At that point, the officers knew that Grandmother had uncharacteristically failed to pick up Child several hours after school had ended, had failed to answer numerous phone calls during her absence, and had not responded to the officers' knocking at her front door. They also knew that a tarp on the living room floor was covering a large object that appeared to be a body and that, all the while, Grandmother was supposed to be caring for a two-month-old infant. The officers had observed a vehicle in the driveway parked askew with its trunk open and had seen the back door of the residence wide open.[2] They knew that, three months prior, a resident had been waving knives around in the house; that police had been called to the home on

_____

543 U.S. 405, 407–08 (2005))); *see also United States v. Porter*, 594 F.3d 1251, 1258 (10th Cir. 2010) (analyzing whether officers had an objectively reasonable basis to believe emergency aid was needed and whether the manner and scope of the search were reasonable). Because Tran has not challenged the manner and scope of the entry and search, we are concerned only with the first inquiry.

[2] On appeal, Tran argues that the officers did not have the authority to enter the backyard of his home and thus we should not consider their discovery of the open back door in analyzing the totality of the circumstances. But Tran did not object to the State's inclusion of this fact in the totality of the circumstances analysis before the district court, and he does not argue on appeal that any of our preservation exceptions apply. *See* UTAH R. CRIM. P. 12(f) ("Failure of the defendant to timely raise defenses or objections or to make requests which must be made prior to trial or at the time set by the court shall constitute waiver thereof . . . ."); *State v. King*, 2006 UT 3, ¶ 13, 131 P.3d 202 ("We have consistently held that a defendant who fails to preserve an objection at trial will not be able to raise that objection on appeal unless he is able to demonstrate either plain error or exceptional circumstances."). As a result, Tran waived any such objection, and we include this fact as a part of the totality of the circumstances.

multiple occasions, including just days before; and that Relative expressed concern about possible retaliation from criminal associates of Grandmother's daughter. Viewed together, these facts provided an objectively reasonable basis to believe that Grandmother may have been in danger or in need of immediate aid inside the home, as Grandmother's whereabouts were concerningly unknown, and circumstances suggesting that she may have been in trouble continued to accumulate after the officers arrived at the home.

¶31 What's more, the officers were not solely concerned for Grandmother's welfare—the facts also provided a reasonable basis to believe that Infant, who was only two months old and wholly incapable of caring for herself, may have required immediate aid in Grandmother's absence or incapacitation. As the district court noted, "One can hardly think of a population of our society more vulnerable or in need of immediate and constant care than a baby of that age."

¶32 Ultimately, whether a warrantless search is reasonable "is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Samson v. California*, 547 U.S. 843, 848 (2006) (cleaned up). Here, while we acknowledge the entry and search of Tran's home were significant intrusions on his privacy, the governmental interest in protecting Grandmother's and Infant's lives through the administration of immediate aid inside the home outweighed that privacy interest. "The preservation of human life is paramount to the right of privacy protected by search and seizure laws and constitutional guaranties," *Stevens v. State*, 443 P.2d 600, 605 (Alaska 1968) (Rabinowitz, J., concurring), and the objective facts available to the officers supported an objectively reasonable belief that Grandmother and Infant were in need of aid. Accordingly, it was reasonable for the officers to forgo obtaining a warrant and to enter the home to render emergency assistance.

¶33 Tran raises several arguments to the contrary. In a piecemeal fashion, fact by fact, Tran singles out individual circumstances and presents more benign explanations for each, attempting to undermine the reasonableness of the officers' belief that Grandmother and Infant were in need of immediate aid. While we understand the utility in pointing out the possible innocent explanations for individual facts, it is a well-settled principle that "courts may not use a divide-and-conquer analysis" in assessing

reasonableness under the Fourth Amendment. *State v. Alverez*, 2006 UT 61, ¶ 14, 147 P.3d 425 (cleaned up). "In other words, courts cannot evaluate individual facts in isolation to determine whether each fact has an innocent explanation." *Id.* Again, the Fourth Amendment analysis requires us to view the reasonableness of the officers' belief given the *totality* of the circumstances. By using a divide-and-conquer strategy, Tran's arguments miss the mark.

¶34 But before moving past the Fourth Amendment analysis, we take this opportunity to respond to a couple of Tran's more specific arguments as to the reasonableness of the officers' belief that Grandmother and Infant needed emergency aid. First, Tran contends that a number of facts supporting the officers' belief fall outside the totality of the circumstances analysis because they are "speculative" and thus "should be afforded little to no weight in the overall analysis." Tran particularly emphasizes the uncertainty surrounding what lay under the tarp in the living room, lamenting that the officers were merely speculating about whether it was a body. In so arguing, Tran highlights that Sergeant Manzanares acknowledged at the evidentiary hearing that while the tarp may have been covering a body, it also could have been true that someone had been painting. Similarly, Officer Peck stated that he "speculated" about whether the tarp was covering a body. Accordingly, in Tran's view, "no non-speculative, objectively reasonable basis existed to conclude that the tarp equaled an emergency" because "[s]peculation is miles away from a reasonable basis."

¶35 While Tran emphasizes the officers' testimonies and their views regarding what may have lain underneath the tarp, his argument is still unconvincing. As we've acknowledged, "there is no black line between inference and speculation." *Heslop v. Bear River Mut. Ins. Co.*, 2017 UT 5, ¶ 22, 390 P.3d 314 (cleaned up). But "a reasonable inference exists when there is at least a foundation in the evidence upon which the ultimate conclusion is based, while in the case of speculation, there is no underlying evidence to support the conclusion." *Id.* (cleaned up). In other words, a reasonable inference not amounting to speculation "is a conclusion reached by considering other facts and deducing a logical consequence from them." *Salt Lake City v. Carrera*, 2015 UT 73, ¶ 12, 358 P.3d 1067 (cleaned up).

¶36 Simply put, the officers' belief that Grandmother and Infant needed immediate aid was not based on speculation but on the facts before them and the reasonable inferences drawn from

those facts. To be sure, there will be circumstances where the need for immediate aid is certain. For example, where an officer sees through an open window an individual being attacked with a knife. But there are other instances where the need to render aid is less obvious. After all, the test under the emergency aid exception to the Fourth Amendment warrant requirement is whether an officer could, under the circumstances, "reasonably *believe* that a person within [a dwelling] is in need of immediate aid." *Mincey*, 437 U.S. at 392 (emphasis added). The test does not require certainty. As the United States Supreme Court has stated, "[o]fficers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception." *Fisher*, 558 U.S. at 49 (cleaned up). This is because "the business of police[] . . . is to act, not to speculate or meditate on whether" an emergency exists. *Wayne v. United States*, 318 F.2d 205, 212 (Burger, Circuit Justice, D.C. Cir. 1963). "People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process." *Id.* Accordingly, all that the Fourth Amendment requires is that the totality of the circumstances supports an objectively reasonable belief that an emergency exists. And the circumstances in this case did exactly that.

¶37   Further, Tran argues that Officers Peck and Crockett didn't really believe anyone needed emergency aid. In support, he points to the officers' decision to call for backup and wait approximately twenty minutes before entering the home to search for Grandmother and Infant. Relying on *State v. Smith*, Tran contends this conduct is objective evidence that undercuts the reasonableness of the officers' belief that there was an emergency. (Citing 2022 UT 13, ¶ 28, 513 P.3d 629.)

¶38   In *Smith*, we applied the community caretaking doctrine—a "separate but related" exception to the Fourth Amendment warrant requirement—to the seizure of a man found sleeping in his car. 2022 UT 13, ¶¶ 1, 14–15. We explained that in applying that doctrine, "courts will scrutinize whether the degree of the intrusion—taking into account both the force displayed and the length of the stop—was commensurate with the perceived public need for aid or protection." *Id.* ¶ 18. Consistent with Fourth Amendment jurisprudence, this inquiry is objective and it examines "whether the officers were acting reasonably within their community caretaking scope." *Id.* ¶ 32 n.5. "If the intrusion exceeds the need," courts will deem the seizure unreasonable. *Id.* ¶ 18.

¶39 In evaluating the objective circumstances in *Smith*, we emphasized that an officer's subjective suspicion of criminality "must not factor into [the] reasonableness analysis." *Id.* ¶ 28. But we allowed that an officer's conduct stemming from that suspicion was "objective evidence that must be weighed within the totality of the circumstances." *Id.* Specifically, in that context, the officers' conduct in responding to a request for a welfare check was objective evidence relevant to our assessment of the degree of the officers' intrusion on Smith's privacy. *See id.* ¶¶ 28–29.

¶40 Here, in contrast, Tran makes no argument that requires us to assess the degree of the officers' intrusion. Instead, Tran challenges the reasonableness of Officer Peck and Officer Crockett's belief that Grandmother and Infant were in need of emergency aid. But, as explained above, the reasonableness of that belief is informed by the objective circumstances facing a reasonable officer—not the actual officers' response to those circumstances. *See supra* ¶¶ 27–28. Thus, even assuming the officers' waiting for backup suggested they did not believe emergency aid was needed, their subjective beliefs do not factor into our reasonableness analysis. *See Brigham City*, 547 U.S. at 404; *Smith*, 2022 UT 13, ¶ 28.

¶41 In sum, the totality of the circumstances supported an objectively reasonable basis for the officers to believe Grandmother and Infant were in need of immediate aid in the home. Among other things, it was unlike Grandmother not to pick up Child from school, she could not be reached by phone, and the officers observed what may have been a murder scene at her residence. All the while, Grandmother was supposed to be caring for two-month-old Infant. So while we generally agree with Tran that "it cannot be the rule that police can search someone's home, without a warrant, just because they were a couple of hours late for school-pickup," that was not the situation that the officers faced here.

## II. TRAN'S ARTICLE I, SECTION 14 CLAIM FAILS FOR THE SAME REASON HIS FEDERAL CLAIM DOES

¶42 Tran also argues, separate and apart from his claim under the Fourth Amendment, that the police officers violated his rights under article I, section 14 of the Utah Constitution when they entered and searched his home without a warrant. In making this argument, Tran asks us to interpret section 14 to provide greater protection against warrantless searches than the Fourth Amendment provides. He argues that under the plain text and the

original public meaning of the provision, there is no exception to the warrant requirement.

¶43   Should we disagree with him, Tran alternatively invites us to adopt the emergency aid exception we articulated in *Brigham City*. In particular, Tran advocates for an inquiry that requires an examination of an officer's subjective intent.

¶44   We commend Tran's counsel for raising and briefing this state law claim.[3] But for the reasons outlined below, we decline at this time to take up his invitations.

*A. The Original Public Meaning of Article I, Section 14 Does Not Foreclose Exceptions to the Warrant Requirement, Including an Emergency Aid Exception*

¶45   We begin with the text of article I, section 14, which reads:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause supported by oath or affirmation, particularly describing the place to be searched, and the person or thing to be seized.

UTAH CONST. art. I, § 14.

¶46   Pointing to the first clause of this text, Tran argues that "*unreasonable* searches and seizures" of one's home "cannot be tolerated." But he also recognizes that the inverse is true: "*reasonable* searches and seizures can be." Tran then argues that the

---

[3] In the search and seizure context, parties often "either do[] not raise or inadequately brief[] a state constitutional claim" under article I, section 14, and rely solely on the Fourth Amendment. *Brigham City v. Stuart*, 2005 UT 13, ¶ 10, 122 P.3d 506, *rev'd on other grounds*, 547 U.S. 398 (2006). Accordingly, we have called for parties to raise and adequately brief state constitutional claims so we may engage in "a principled exploration of the interplay between federal and state protections of individual rights." *Id.* ¶ 14. We commend counsel here for responding to "our call . . . for litigants to participate in the development of state constitutional principles," *State v. Tiedemann*, 2007 UT 49, ¶ 38, 162 P.3d 1106, and for counsel's willingness to take on this task. We continue to encourage parties to press state constitutional claims to further develop these important principles.

second clause of section 14, which states that "no warrant shall issue but upon probable cause," UTAH CONST. art. I, § 14, "informs our understanding of what constitutes a reasonable search" under the first clause. Specifically, he argues that because the word "and" links the two clauses, a search must be conducted pursuant to a warrant to be reasonable under Utah's constitution. And it follows, in Tran's view, that "no exception would justify the warrantless search of one's home under article I, section 14."

¶47   In further support of this proposition, Tran cites various newspaper articles from the ratification era recounting Utahns' disdain for warrantless searches of their homes. As a brief sample, one contemporaneous article stated: "No person claiming to be an officer has any more right than a private citizen to enter any one's dwelling without the consent of the owner, unless he has a warrant in proper form authorizing him to make a search." *Unwarrantable Intrusions*, DESERET NEWS, Jan. 28, 1885, at 8. Another article noted how the people of the ratification era should "underst[and] that the constitutional protection of house and home will not be trampled down with impunity by lawless villains," and that "[n]o officer has the right to force his way into a house without a proper warrant." *Rights that Must Be Maintained*, DESERET NEWS, Jan. 27, 1886, at 6.

¶48   While the articles Tran cites provide the sense that Utahns generally disliked the government barging into their homes without consent or a warrant, they tell us little more than that. Critically, the historical sources Tran points to do not discuss whether Utahns viewed it as reasonable for law enforcement to enter a home without a warrant if there was an emergency inside. These sources simply convey what remains the case today: Utahns believed that the police should generally obtain a warrant before entering a home, and that it is presumptively unreasonable to enter a home without a warrant. This sentiment alone does not counsel us to hold that no exception to the warrant requirement exists under the original public meaning of article I, section 14.

¶49   Moving on from historical articles, Tran next points to the 1888 Compiled Laws of Utah and its treatment of the warrant requirement. These laws included only a single narrow exception: "When a person charged with a felony is supposed to have on his person a dangerous weapon, or anything which may be used as evidence of the commission of the offence, the officer making the arrest shall cause him to be searched . . . ." COMPILED LAWS OF UTAH § 5421 (1888). But for Tran, this exception is a double-edged sword. While Tran may use it to argue that a search incident to arrest was

the only exception to the warrant requirement at the time of statehood, the existence of this exception undermines his argument that no exception exists at all given the original public meaning of article I, section 14. And the fact that the ratification-era laws did not include a specific emergency aid exception to the warrant requirement does not foreclose us from recognizing such an exception today. This is because "[t]he Utah Constitution enshrines principles, not application of those principles." *S. Salt Lake City v. Maese*, 2019 UT 58, ¶ 70 n.23, 450 P.3d 1092.

¶50 Ultimately, the text of article I, section 14 is clear: by specifically prohibiting *unreasonable* searches and seizures, the provision impliedly permits *reasonable* searches and seizures. This language has meaning, as the provision could just have easily prohibited "warrantless" searches and seizures altogether. We read section 14's reasonableness standard in line with the United States Supreme Court's interpretation of Fourth Amendment reasonableness:

> [T]his Court has inferred that a warrant must generally be secured. It is a basic principle of Fourth Amendment law . . . that searches and seizures inside a home without a warrant are presumptively unreasonable. But we have also recognized that this presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is reasonableness. Accordingly, the warrant requirement is subject to certain reasonable exceptions.

*Kentucky v. King*, 563 U.S. 452, 459 (2011) (cleaned up).

¶51 Thus, Tran's textual and original public meaning arguments do not persuade us that article I, section 14 forecloses reasonable exceptions, including an emergency aid exception, to the provision's warrant requirement.

*B. We Decline, in this Case, to Expand Article I, Section 14's Protection Beyond the Fourth Amendment's*

¶52 Next, Tran argues in the alternative that if we remain open to recognizing an emergency aid exception under article I, section 14, we should revive the three-prong test we previously applied under the Fourth Amendment in *Brigham City v. Stuart*, prior to its reversal by the United States Supreme Court. *See* 2005 UT 13, ¶ 23, 122 P.3d 506, *rev'd*, 547 U.S. 398 (2006). Under the *Brigham City* test,

the emergency aid exception applied when the following elements were met:

> (1) Police have an objectively reasonable basis to believe that an emergency exists and believe there is an immediate need for their assistance for the protection of life.

> (2) The search is not primarily motivated by intent to arrest and seize evidence.

> (3) There is some reasonable basis to associate the emergency with the area or place to be searched.

*Id.* (cleaned up).

¶53 In advocating for our adoption of this standard under article I, section 14, Tran primarily focuses his attention on the second element. In his eyes, the utility of assessing "the subjective intent of the officers is an appropriate and necessary check against using the emergency aid doctrine as an end-run around the protections of article I, section 14." To Tran, "exceptions to the warrant requirement 'must be limited in application to prevent police from using a suspicionless exception . . . as pretext for ordinary [criminal] investigation.'" (Quoting *State v. Smith*, 2022 UT 13, ¶ 15, 513 P.3d 629.) And as he sees it, "[r]equiring an inquiry into the police officers' subjective intent balances law enforcement's duty 'to perform noncriminal community caretaking functions' with the people's right to be free from unreasonable searches in their homes." (Quoting *Caniglia v. Strom*, 593 U.S. 194, 199 (2021).)

¶54 We decline at this time to extend article I, section 14's protection by adopting the *Brigham City* test, including its subjective intent element. First, Tran has provided relatively little in the way of analysis as to why we should deviate from the text of section 14, which, as alluded to above, simply requires warrantless searches to be reasonable—traditionally a purely objective standard. *See, e.g.*, *Scott v. United States*, 436 U.S. 128, 137 (1978) ("[I]n making [the reasonableness] assessment[,] it is imperative that the facts be judged against an objective standard; would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?" (cleaned up)).

¶55 Further, even if we were inclined to adopt the *Brigham City* test, it would not aid Tran's appeal. Tran has not argued that the officers' entry and search of his home was primarily motivated by

an intent to arrest and seize evidence. Thus, his state constitutional claim would fail for the same reason his Fourth Amendment claim fails—the officers had an objectively reasonable basis to believe emergency assistance was needed. And since the outcome does not turn on whether we extend article I, section 14's protection to include *Brigham City*'s subjective intent element, we do not find it prudent to make such an extension in this case.

¶56 Until we are presented with a persuasive argument to extend section 14's protection beyond the Fourth Amendment's—in a case that turns on that extension—we will apply the federal emergency aid exception standard to both state and federal constitutional claims. Accordingly, Tran's state constitutional claim fails on the same ground as his Fourth Amendment claim.

## CONCLUSION

¶57 The State argues we should adopt a strict order of operations in reviewing search and seizure claims—analyzing federal constitutional claims before reaching state constitutional claims. But we see no utility in tying our hands in such a manner. Because each case may present different facts and briefing by the parties that make it useful to address one claim before the other, a case-by-case approach is the most effective.

¶58 On the merits, we affirm the district court's denial of Tran's motion to suppress. We hold that the totality of the circumstances known by the police officers at the time they entered Tran's home supported an objectively reasonable basis to believe that Grandmother and Infant were in need of immediate aid. Thus, the entrance and search fall within the emergency aid exception to the warrant requirement of the Fourth Amendment.

¶59 And while we commend Tran's counsel for raising and briefing his state law claim under article I, section 14 of the Utah Constitution, we do not, at this time, extend the provision's protection beyond that of the Fourth Amendment. Accordingly, because the officers' warrantless entry and search of Tran's home were reasonable and justified under the federal emergency aid exception, the entry and search were also reasonable and justified under section 14.

————————————